IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PRIME ENERGY AND CHEMICAL, LLC** | : | CIVIL NO. 2:18-CV-0345 |
| | : | |
| **Plaintiff,** | : | |
| | : | (Judge Kane) |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| **TUCKER ARENSBERG, P.C., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM AND ORDER**

I.   **Factual Background**

The parties have, once again, invited us to address a discovery dispute in this contentious litigation. The background of this dispute is thoroughly detailed by the district court in a series of opinions addressing dispositive motions. See Prime Energy & Chem., LLC v. Tucker Arensberg, P.C., No. CV 18-345, 2018 WL 3541862, at *1 (W.D. Pa. July 23, 2018), Prime Energy & Chem., LLC v. Tucker Arensberg, P.C., No. 2:18-CV-00345, 2019 WL 3778756, at *1 (W.D. Pa. Aug. 12, 2019). However, for purposes of our consideration of this discovery dispute, the pertinent facts can be simply stated:

The plaintiff, Prime Energy, is a Florida-based oil and gas company that entered into a contractual agreement with certain businesses operated by a man named Mark Thompson. Thompson and his businesses were clients of the defendant

1

law firm and attorney, which performed legal work relating to this transaction. This agreement between Prime Energy and the Thompson-related entities involved the $3 million purchase of assets at the oil and gas property known as the "Swamp Angel" property in McKean County, Pennsylvania. According to the plaintiff's complaint, in 2015 and 2016, Prime Energy engaged in a series of transactions with Mr. Thompson and his businesses in connection with this agreement. These transactions and their aftermath gave rise to this lawsuit. In its complaint, Prime Energy asserts that, in connection with these transactions, the defendant law firm and attorney engaged in a series of fraudulent activities relating to the ownership of the property, the disposition of deposit money, concealment of other litigation relating to the property, and other alleged cover-ups. Prime Energy also brings claims against the defendants grounded in recklessness, negligence, and *respondeat superior* liability. (Doc. 50). Prime Energy alleges that it suffered a series of significant direct and consequential damages as a result of this fraud. (Id.)

With Prime Energy's claims framed in this fashion, the parties have engaged in a course of discovery which has been at times acrimonious. As part of that discovery, the plaintiff filed a motion to compel, which initially sought to compel the production of four categories of information. (Doc. 85). Upon reflection, Prime Energy agreed to abandon or defer discovery of a number of these items but in 2020, continued to seek information regarding the law firm's receipt and disposition of a

$50,000 deposit payment that was made in connection with the Swamp Angel transactions and received by the defendants. Prime Energy alleged that these funds were stolen and misapplied by the defendants when they were used to pay other outstanding obligations that Thompson and Thompson-controlled entities owed to the defendants. The defendants responded to this request by asserting that they have provided all the information regarding the disposition of these funds in depositions and have produced the invoices relating to the receipt and disposition of this payment to the plaintiff, albeit in a redacted form. Prime Energy's rejoinder to this assertion is that it should receive the invoices in their unredacted form and should also be provided pertinent portions of the defendant law firm's ledgers.

With respect to Prime Energy's questions concerning the receipt and disposition of the $50,000 deposit the defendant law firm received as part of the Swamp Angel transaction, it was unclear to us what further information Prime Energy hoped to obtain beyond that previously disclosed by the defendants, namely, that:

> Michael Shiner testified at his deposition that he and Tucker Arensberg represented Mark Thompson in multiple matters and, at Mark Thompson's request, did not break apart the work that they performed for Mark Thompson and Mid East Oil Company into separate invoices according to the specific matter. All work for Mark Thompson, including work performed with regard to the Swamp Angel Transaction, was invoiced to Mark Thompson and Mid East Oil Company, together, on invoices captioned "RE: Apollo Global Management," which was the name of very first matter with regard to which Michael Shiner and Tucker Arensberg represented Mark

3

> Thompson. As Michael Shiner testified at his deposition, the $50,000 payment of legal fees that was received from Mid East Oil Company "during the time that the negotiation and work on the Swamp Angel sale was ongoing," was applied to the invoices captioned "RE: Apollo Global Management" which included, thereon, work that Michal Shiner and Tucker Arensberg had performed to that date on the Swamp Angel Transaction as well as other matters. See Michael Shiner deposition testimony, pp. 51-57.

(Doc. 92, at 16). Further, to the extent that the gravamen of Prime Energy's claim was that this money was used to pay legal fees that were unrelated to the Swamp Angel transaction, it seemed that the parties could stipulate to this fact. We also understood that client billing records could contain unrelated entries of a sensitive nature which would appropriately be the subject of redaction. Nonetheless, acting out of an abundance of caution, and in order fully address Prime Energy's concerns, we ordered the defendants to produce the responsive materials in their possession to the court *in camera*, in both redacted and unredacted forms, for our review. (Doc. 123).

We then thought that events had overtaken this discovery order and our assistance was no longer needed here. We reached this conclusion because we construed a status report filed by the parties on October 7, 2020, as indicating that there were no outstanding unresolved discovery issues in this case. (Doc. 134). Our belief that the parties had resolved their discovery disputes without further intervention by the court turned out to be wrong as we learned earlier this year when plaintiff's counsel, who had previously joined in the status report that led us to

4

understand that all discovery issues were resolved, now reported to this district court that the plaintiff was awaiting an *in camera* review of these billing records. (Doc. 165).

Advised in this elliptical fashion of this outstanding discovery question, we received supplemental communications from counsel. For its part, Prime Energy, which has renewed this discovery inquiry, now makes what we regard as a new proffer of relevance for these records. Instead of focusing narrowly upon this $50,000 payment, Prime Energy now alleges more broadly that the billing records from September 2015 through December 2016 may now reveal that the defendants were aware of various regulatory matters and litigation involving the Swamp Angel property at the time of the sale of that property. According to Prime Energy, these regulatory issues and pending litigation were material matters which needed to be disclosed, and the law firm's work on these matters at the time of the alleged non-disclosure of this information would be relevant to their claims since it could show a knowing failure to disclose material facts.

For their part, the defendants protest what they regard as an eleventh hour expansion of the proffer of relevance in this case and assert that the billing records, which our *in camera* review reveals are redacted almost in their entirety, are wholly cloaked in privilege. However, we have not received a privilege log and our examination of the records in their redacted and unredacted forms does not allow us

to make fully informed decisions regarding whether specific entries relate to regulatory matters and litigation involving the Swamp Angel property, the subject of the plaintiff's latest proffer of relevance.

As discussed below, given the current proffer of relevance, we find that these heavily redacted records may contain information that is relevant to the defendants' state of mind and knowledge of legal entanglements effecting the value of the Swamp Angel property side-by-side with privileged communications. Therefore, we will direct the defendants to individually review these billing records and identify those records which reflect work done on regulatory matters and litigation involving the Swamp Angel property. These relevant records will then be produced in a redacted form to the plaintiff along with a privilege log detailing the claims of privilege made with respect to the redacted information.

**II.    Discussion**

Rulings regarding the proper scope of discovery are matters consigned to the court's discretion and judgment. A court's decisions regarding the conduct of discovery will be disturbed only upon a showing of abuse of that discretion. Marroquin-Manriquez v. I.N.S., 699 F.2d 129, 134 (3d Cir. 1983). This far-reaching discretion also extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

> District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. See Farmers & Merchs.

Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F.R.D. 572, 585 (D.N.J. 1997).  When a magistrate judge's decision involves a discretionary [discovery] matter . . ., "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard."  Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 174 (E.D. Pa. 2004) (citing Scott Paper Co. v. United States, 943 F. Supp. 501, 502 (E.D. Pa. 1996)).  Under the standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion."  Kresefky v. Panasonic Commc'ns and Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996); see also Hasbrouck v. BankAmerica Hous. Servs., 190 F.R.D. 42, 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than de novo standard); EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y. 2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

Halsey v. Pfeiffer, No. 09-1138, 2010 WL 2735702, at *1 (D.N.J. Sept. 27, 2010).

The exercise of this discretion is guided, however, by certain basic principles. At the outset, Rule 26(b) of the Federal Rules of Civil Procedure generally defines the scope of discovery permitted in a civil action, prescribes certain limits to that discovery and provides as follows:

(b) Discovery Scope and Limits.

(1) *Scope in General*. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the

7

>burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b).

Thus, our discretion is limited in a number of significant ways by the scope of Rule 26 itself, which provides for discovery of only "nonprivileged matter that is relevant to any party's claim or defense." Therefore, "[t]he Court's discretion in ruling on discovery issues is, therefore, restricted to valid claims of relevance and privilege." Robinson v. Folino, No. 14-227, 2016 WL 4678340, at *2 (citing Jackson v. Beard, No. 11-1431, 2014 WL 3868228, at *5 (M.D. Pa. Aug. 6, 2014) ("[a]lthough the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, it is not without its limits....Courts will not permit discovery where a request is made in bad faith, unduly burdensome, irrelevant to the general subject matter of the action, or relates to confidential or privileged information")).

A party moving to compel discovery bears the initial burden of proving the relevance of the requested information. Morrison v. Phila. Housing Auth., 203 F.R.D. 195, 196 (E.D. Pa. 2001). Once that initial burden is met, "the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Fed.R.Civ.P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption

8

in favor of broad disclosure." In re Urethane Antitrust Litigation, 261 F.R.D. 570, 573 (D. Kan. 2009). Likewise, "[i]n deciding whether a federal privilege against discovery exists, . . . the objecting party ha[s] the burden of establishing the privilege." Bayges v. Se. Pennsylvania Transp. Auth., 144 F.R.D. 269, 271 (E.D. Pa. 1992). Indeed, because the assertion of a claim of privilege "may result in the withholding of relevant information and so may obstruct the search for truth," In re Chevron Corp., 633 F.3d 153, 164 (3d Cir. 2011), it is well established that, " '[t]he burden of proving that the . . . privilege applies is placed upon the party asserting the privilege.'" Matter of Grand Jury Empanelled February 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979) (quoting United States v. Landof, 591 F.2d 36, 38 (9th Cir. 1978)).

In this case, the defendants rely upon the attorney-client privilege and the work-product doctrine to justify the decision to withhold these billing records. The legal tenets which govern this privilege analysis are also familiar ones. The Court of Appeals has summarized the purposes of, and distinctions between, the attorney-client privilege and the work-product doctrine, and the importance of limiting recognition of evidentiary privileges when necessary to achieve their purposes, as follows:

> Though they operate to protect information from discovery, the work-product doctrine and the attorney-client privilege serve different purposes. The purpose behind the attorney-client privilege is " 'to

9

> encourage clients to make full disclosure of facts to counsel so that he may properly, competently, and ethically carry out his representation. The ultimate aim is to promote the proper administration of justice.' " In re Impounded, 241 F.3d 308, 316 (3d Cir. 2001) (quoting In re Grand Jury Proceedings, 604 F.2d 798, 802 (3d Cir. 1979)). The work-product doctrine, by contrast, "promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1428 (3d Cir. 1991) (citations omitted).

In re Chevron Corp., 633 F.3d at 164.

The attorney-client privilege is meant to facilitate "full and frank communication between attorneys and their clients." Wachtel v. Health Net, Inc., 482 F.3d 225, 231 (3d Cir. 2007). The privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn v. United States, 449 U.S. 383, 389 (1981). The privilege "applies to any communication that satisfies the following elements:  it must be '(1) a communication (2) made between [the client and the attorney or his agents] (3) in confidence (4) for the purposes of obtaining or providing legal assistance for the client.' " In re Teleglobe Communications Corp., 493 F.3d 345, 359 (3d Cir. 2007) (quoting the Restatement (Third) of the Law Governing Lawyers § 68 (2000)). Thus, the privilege reaches "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." Fisher

10

v. United States, 425 U.S. 391, 403 (1976); see also In re Ford Motor Co., 110 F.3d 954, 965 n.9 (3d Cir. 1997) (communication made by client and an attorney are privileged if made "for the purpose of securing legal advice."); United States v. Amerada Hess Corp., 619 F.2d 980, 986 (3d Cir. 1980).

The privilege applies both to information that the client provides to the lawyer for purposes of obtaining legal advice, as well as to the advice the attorney furnishes to the client. To this end, the Supreme Court has explained that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Upjohn, 449 U.S. at 390.

The work-product privilege, in turn, is a creature of federal law, see Fed. R. Civ. P. 26(b)(3)(A), and "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." In re Cendant Corp. Sec. Litig., 343 F.3d 658, 661-62 (3d Cir. 2003). As the Third Circuit has explained:

> The purpose of the work-product doctrine differs from that of the attorney-client privilege . . . . [T]he attorney-client privilege promotes the attorney-client relationship, and, indirectly the functioning of our legal system, by protecting the confidentiality of communications between clients and their attorneys. In contrast, the work-product doctrine promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used again their clients.

11

Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1427-28 (3d Cir. 1991).  Furthermore,

> The doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system.  One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial.  It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

United States v. Nobles, 422 U.S. 225, 238-39 (1975) (footnote omitted).

Given these animating principles, Rule 26(b)(3) shields from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent." Fed. R. Civ. P. 26(b)(3)(A). The rule also establishes two categories of protected work product:  fact work product and opinion work product. "Fact work product is discoverable only upon a showing [of] 'substantial need' and by demonstrating that one cannot otherwise obtain the 'substantial equivalent' of such materials without 'undue hardship.'" In re Linerboard Antitrust Litig., 237 F.R.D. 373, 381 (E.D. Pa. 2006) (quoting Fed. R. Civ. P. 26(b)(3)). Opinion work product, "which consists of 'mental impressions, conclusions, opinions, or legal theories of an attorney,' is afforded almost absolute protection" and it "is discoverable 'only upon a showing of rare and exceptional circumstances.'" Linerboard, 237 F.R.D. at 381 (quoting Cendant, 343 F.3d at 663).

12

When examining privilege claims we must be mindful of two other legal tenets. First, while recognizing the value served by these privileges, courts must be mindful that the privileges obstruct the truth-finding process and should, therefore, be "applied only where necessary to achieve its purpose." Wachtel, 482 F.3d at 231; see also Westinghouse Elec. Corp., 951 F.2d at 1423. Finally, when addressing legal questions regarding whether the attorney client or work product privileges apply to particular documents, we are cautioned to eschew any categorical approach which cloaks or rejects the privilege in a wholesale fashion without regard to the specific content of particular documents. Instead, "claims of attorney-client privilege must be asserted document by document, rather than as a single, blanket assertion." United States v. Rockwell Int'l, 897 F.2d 1255, 1265 (3d Cir. 1990).

Because the defendants, as the proponent of the privilege bear the burden of proof on claims of privilege, it is often critically important that any privilege log adequately outline the basis of the privilege claim. On this score we have described the legal requisites of a valid privilege log in the following terms:

> The privilege log should: identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between...individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony. Even under this approach, however, if the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, his claim will be rejected. Bowne, 150 F.R.D. at 474 (citations omitted); see also

13

von Bulow, 811 F.2d at 146; In re Grand Jury Subpoena Dtd. Jan. 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984). United States v. Constr. Products Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996).

Farkas v. Rich Coast Coffee, Corp., No. 1:14-CV-272, 2016 WL 4611427, at *4 (M.D. Pa. Sept. 6, 2016).

In the instant case, the subject matter of this discovery dispute consists of the defendant law firm's billing records. It is well settled that such records may contain privileged information, "because they reveal the nature of the services . . . rendered." Montgomery Cnty. v. MicroVote Corp., 175 F.3d 296, 304 (3d Cir. 1999). However, courts have also recognized that billing records may contain information that is not cloaked in privilege which may be relevant to a lawsuit. As one court has explained:

> It appears that both privileged and non-privileged material may exist side-by-side in many of the [billing records]. For example, a typical time sheet may contain several different pieces of information, such as the attorney's name, the client's name, the general matter being worked on if the attorney has represented the client on more than one matter, the date and time the services were provided, as well as a description of the actual legal services performed. In this example, only the last item of information would generally be protected under the attorney-client privilege and should be redacted before production. Similarly, in an accounts ledger, one entry may indicate an invoice number and its corresponding remittance check number. In this example, generally no information would be privileged. However, the actual invoice may contain privileged information in the "for X services rendered" column, for example. Likewise, the check may have privileged information on the Memo line, *i.e.,* "payment for X legal services," if X is sufficiently detailed. In that case, the privileged information should be redacted.

14

Leach v. Quality Health Servs., 162 F.R.D. 499, 501–02 (E.D. Pa. 1995). Where privileged and non-privileged information may exist side-by-side in billing records, courts have reconciled these privilege concerns by directing that the records be released subject to redaction. Id. Adopting this course is particularly appropriate in a case such as this, where we are not provided with a privilege log and the legal, logical, topical, and temporal connection between various billing entries and the Swamp Angel property is not immediately apparent.

      This is the path we will follow in resolving this last discovery dispute. While aspects of these records may be cloaked in privilege, the fact that the defendants were performing work on litigation and regulatory matters relating to the Swamp Angel property at the time of this sale of this property may be relevant to the issue of whether there was a knowing failure to disclose material information to Prime Energy, the purchaser of the property. Recognizing that the records may contain relevant and non-privileged information side-by-side with privileged communications, we will direct the defendants to individually review these billing records and identify those records which reflect work done on regulatory matters and litigation involving the Swamp Angel property. These relevant records will then be produced in a redacted form to the plaintiff along with a privilege log detailing the claims of privilege made with respect to the reacted information.

      An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PRIME ENERGY AND CHEMICAL, LLC** | : | CIVIL NO. 2:18-CV-0345 |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Kane)** |
| v. | : | |
| | : | **(Magistrate Judge Carlson)** |
| **TUCKER ARENSBERG, P.C., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## **ORDER**

And now this 24th day of May 2022, with respect to the discovery dispute between the parties relating to disclosure of the defendant law firm's billing records, IT IS ORDERED as follows: On or before **July 5, 2022**, the defendants shall individually review these billing records and identify those records which reflect work done on regulatory matters and litigation involving the Swamp Angel property. These relevant records will then be produced in a redacted form to the plaintiff along with a privilege log detailing the claims of privilege made with respect to the reacted information.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge