UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

PRIME ENERGY AND CHEMICAL, LLC,  :
                                  :
           Plaintiff,             :
                                  :   Civil Action No. 18-cv-345
     v.                         :
                                  :
TUCKER ARENSBERG, P.C., and     :
MICHAEL A. SHINER,            :
                                  :
           Defendants.       :

**DEFENDANTS' REVISED CONCISE STATEMENT OF
<u>MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Defendants, Tucker Arensberg, P.C. and Michael A. Shiner, by and through their undersigned counsel, respectfully submit this Revised Concise Statement of Material Facts in Support of Motion for Summary Judgment, pursuant to this Honorable Court's September 8, 2022 Order (ECF Document 206), March 9, 2023 Order (ECF Document 249), and Local Rule 56.B.1, asserting as follows:

1.      This is an action for fraud filed by Plaintiff, Prime Energy and Chemical, LLC ("Prime") against Defendants Michael A. Shiner, Esquire ("Shiner") and his law firm Tucker Arensberg, P.C. (collectively the "Tucker Arensberg"). *See generally*, ECF 217-2 (Second Am. Complaint, appended hereto as Ex. 1.)

2.      It arises out of the purchase and sale of an oil and gas lease known as "Swamp Angel/Music Mountain" (the "Swamp Angel Lease") located in McKean County, Pennsylvania (the "Swamp Angel Transaction"). *See generally*, ECF 217-2 (Second Am. Complaint).

3.     Prime purchased the Swamp Angel Lease from MarcellX, LLC ("MarcellX") on July 21, 2016.  *See* ECF 217-3 at pp. 11-12 (D.T. of Prime 30(b)(6), pp. 57, 61, appended hereto as Ex. 2).

4.     Prime no longer owns the Swamp Angel Lease having assigned the same to First American Energy, Inc. on March 23, 2017 – i.e., prior to filing the instant lawsuit.  *See* ECF 217-3 at p. 12 (D.T. of Prime 30(b)(6), pp. 61-62).

5.     Prime is currently an inactive Florida corporation.  *See* ECF 217-4 at p. 4 (D.T. of Acunto, p. 11, appended hereto as Ex. 3).

6.     When the corporation was active, John Acunto ("Acunto") served as its CEO and Chairman and Russell Parker ("Parker") served as its President.  *See* ECF 217-3 at p. 3 (D.T. of Prime 30(b)(6), p. 7); *see also* ECF 217-4 at p. 3 (D.T. of Acunto, pp.7-8).

7.     Tucker Arensberg represented non-parties to this lawsuit, Mark Thompson ("Thompson") and his company, Mid East Oil with regard to the Swamp Angel Transaction.  *See* ECF 217-2 at pp. 2-4 (Second Am. Complaint ¶¶1-2).

8.     Thompson along with other non-parties to this lawsuit – i.e., David, Daniel, and John Prushnok (the "Prushnok Brothers") – were members of MarcellX.  *See* ECF 217-5 at pp. 2-3 (December 18, 2015 Resolution, hereinafter "Resolution", appended hereto as Ex. 4) (previously marked as Parker 4)).

9.     Thompson, at one point in time, owned 50% and the Prushnok Brothers collectively owned the other 50% of MarcellX.  *See* ECF 217-6 at p. 3 (D.T. of David Prushnok, p. 12, appended hereto as Ex. 5).

10.    The members of MarcellX gave Thompson authority to enter into the Swamp Angel Transaction on MarcellX's behalf.  *See* ECF 217-5 at pp. 2-3 (Resolution cited at length *infra*).

11.     Tucker Arensberg was not a party to the Swamp Angel Transaction.  *See* ECF 217-7 at p. 2 (PSA, appended hereto as Ex. 6 (previously marked as Acunto 16)).

### The Swamp Angel Transaction

12.     The Swamp Angel Transaction was governed by a Purchase and Sale Agreement ("PSA"), dated November 25, 2015, between Mid-East Oil and MarcellX (collectively identified as the "Seller" in the PSA) and Prime (identified as the "Buyer" in the PSA) as executed on December 15, 2015.  *See* ECF 217-7 at p. 2 (PSA); *see also* ECF 217-8 at p. 3 (D.T. of Parker, pp. 87-88, appended hereto as Ex. 7).

13.     The PSA is a fully integrated written document with an "integration clause" that states:

> **13.     Entire Agreement.** This Agreement constitutes the entire agreement among the parties and ***supersedes any prior understandings, agreements, or representations*** by or among the parties, written or oral, including the Letter of Intent, to the extent that they have related in any way to the subject matter of this Agreement.

*See* ECF 217-7 at pp. 10-11 (PSA ¶13 (emphasis added)).

14.     Paragraph eight (8) of the PSA also states, "[Prime] acknowledges that . . . (iv) in entering into this agreement, [Prime] has relied solely on . . . the advice of its own legal . . . advisors and ***not on any comments or statements of any representatives of or consultants or advisors engaged by Seller***."  *See* ECF 217-7 at p. 9 (PSA ¶8(a)(iv) (emphasis added)).

15.     In addition to its acquisition of the Swamp Angel Lease, Prime purchased: (1) 100% of the Seller's interest in 89 existing oil and gas wells (the "Swamp Angel Wells"); (2) 100% of the Seller's interest in 80 additional wells (the "Music Mountain Wells"); (3) all personal property and equipment located on or used in connection with the Swamp Angel and Music Mountain Wells; (4) all associated surface property rights (i.e., easements and rights of way); and (5) all

books, records, etc. pertaining to the lease and wells.  *See* ECF 217-7 at pp. 2-3, 22-26 (PSA ¶1(b)-(e), Exhibits "B", "C-1").

16.     The "Purchase Price" was $3,000,000.00, and was to be paid at "Closing."  *See* ECF 217-7 at p. 3 (PSA ¶2).

17.     The Closing was originally supposed to occur on December 22, 2015.  *See* ECF 217-7 at p. 4 (PSA ¶4).

18.     Prime agreed to "***deliver to Seller the Purchase Price by wire transfer in immediately available U.S. funds to the accounts specified in writing by Seller to [Prime.]***"  *See* ECF 217-7 at p. 5 (PSA ¶4(b)(i)) (emphasis added).

19.     Seller agreed to, "deliver to [Prime] releases of all liens and encumbrances on the Wells, if any[.]"  *See* ECF 217-7 at p. 4 (PSA ¶4(a)(iii)).

20.     The PSA further includes a provision addressing certain pre-closing duties and obligations of the parties regarding "capital expenditures" being funded by the Buyer.  This provision states:

> It is Acknowledged and Agreed to, the amount of $165,000 (non-refundable) has been deposited into the "Seller's" attorney's account as an initial deposit toward capital expenditures.  It is also acknowledged that within 5 business days of the signature of this Purchase and Sales Agreement an additional $435,000.00 will be deposited by electronic wire into the "Seller's" attorney's account totaling $600,000.  "Seller" will produce at closing, an expense list of capital and legal expenditures that have already been paid out to begin the operation such as surveying, laying out well sites, clearing roads, installing platforms etc. up to $600,000 designated as the first draw down to be paid by wire on or before closing on **December 22, 2015**.  **In addition another $500,000 will be paid at closing on December 22, 2015, by wire for the second draw down payment to keep the operation moving forward as soon as possible, conditionally only if all requested documents, such as: current lease title search, all books, files, maps, records and reports (including, electronic data files that would not violate any license or law) pertaining primarily to the Leases and Wells, including, but not limited to, inspection reports, payment records, production reports, logs, and/or reports and filings to any state or federal agency (collectively, the**

**"Records") after signing of this agreement and before closing on or about December 22, 2015.**

*See* ECF 217-7 at p. 3-4 (PSA ¶2) (emphasis in original).

21.     The parties expressly contemplated that Prime was contracting the Seller to perform the duties of operator for the "continued operation of the [existing] Wells", Seller expected to receive "15% of the gross sales price paid for each barrel of oil produced", and the Seller would be entitled to participate in future "oil and gas drilling on the Lease" for new wells.  *See* ECF 217-7 at p. 11 (PSA ¶16).

22.     Regarding both the operating duties and the participation rights, the PSA references the contemporaneous execution of two additional documents, namely a "Well Operating Agreement" and a "Participation Agreement."  *See* ECF 217-7 at p. 11 (PSA ¶16).

23.     Finally, the PSA contains the following due diligence and warranty provisions:

**5.     <u>Inspections and Due Diligence</u>.**  Buyer shall have the right to inspect the Lease, Wells and Records prior to the Closing Date. . . .

a.   Upon request and until Closing, Seller shall make available for examination by Buyer such title information . . . as may currently exist.  NO WARRANTY OF ANY KIND IS MADE BY SELLER AS TO THE INFORMATION SO SUPPLIED and Buyer agrees that any conclusions made therefrom shall be the result of its own independent review and judgment.

b.   Buyer shall promptly notify Seller of any Material Defect in writing at least five (5) days prior to Closing which Buyer identifies during its inspection and due diligence.  If Seller does not receive timely notice of a Material Defect, then Seller's interests in the Wells shall be deemed free of title defects and adverse conditions. . . .

\*     \*     \*

**6.     Representations and Warranties.**

a.   Seller's Representations:

ii.      Authority.  Seller has the requested power and authority to enter into this Agreement, to carry out the transactions contemplated hereby, to transfer the Lease, Wells and Records in the manner contemplated by this

Agreement, and to undertake all of the obligations of Seller set forth in this Agreement.

\*   \*   \*

viii.   Litigation.  Other than as disclosed on Schedule __, the Lease and Wells: (a) are not subject to any outstanding injunction, judgment, order, decree, ruling, or charge; and (b) are not the subject of any pending, or threatened claim, demand, filing, cause of action, administrative proceeding, governmental action or other litigation.

*See* ECF 217-7 at pp. 5-7 (PSA ¶¶ 5(a)-(b), 6(a)(ii), (viii)) (emphasis in original).

24.     The PSA was amended twice.  *See* ECF 217-9 and ECF 217-10.

25.     First, on January 4, 2016, Mid-East Oil and MarcellX (collectively identified as the "Seller" in the first amendment) and Prime (identified as the "Buyer" in the first amendment) entered into an Amendment to Purchase and Sale Agreement.  *See* ECF 217-9 at pp. 4-6 (Jan. 4, 2016 Amendment, appended hereto as Ex. 8) (previously marked as Acunto 21).

26.     The pertinent provisions of this first amendment are as follows:

WHEREAS, the [PSA] set forth a date of closing of December 22, 2015; however, **Buyer, in breach of the [PSA]**, did not consummate the closing.

\*   \*   \*

**Closing Date.** The Seller and Buyer agree that the closing ("Closing") shall take place at 10:00 a.m. EDT, on a date mutually agreed upon by the parties occurring after January 15, 2016, and on or before January 31, 2016 (such date of closing being the "Closing Date"), at a location mutually agreed upon by the parties.

ECF 217-9 at pp. 4-5 (Jan. 4, 2016 Amendment ¶2) (emphasis added).

27.     The second amendment was entered into on March 17, 2016, when Prime (identified as the "Buyer" in the second amendment) and MarcellX (identified as the "Seller" in the second amendment) entered into an Extension Agreement to Purchase and Sale Agreement. *See* ECF 217-10 (March 17, 2016 Extension Agreement, appended hereto as Ex. 9) (previously marked as Acunto 31).

28.     The pertinent provisions of this second amendment are as follows:

WHEREAS, **the above-named parties entered into that certain Purchase and Sale Agreement (the "PSA"), dated November 25, 2015,** for the purchase and sale of certain leasehold rights as well as certain oil and gas wells . . . which were, are and remain property of Seller;

WHEREAS, **by virtue of the PSA, and an amendment to the same dated January 4, 2016**, a closing was required to occur no later than January 31, 2016 and said closing did not occur: and

WHEREAS, Seller and Buyer . . . agree to this Extension Agreement to the PSA . . . by setting forth a new date of closing and the terms contained herein.

*     *     *

2.     Closing Date. The Seller and Buyer agree that the closing ("Closing") shall take place no later than Friday, July 15, 2016 . . . .

3.     Due Diligence/Counsel.     Buyer agrees and acknowledges that it has completed its due diligence as reflected in Paragraph 8 of the PSA and Buyer agrees that its concerns have been resolved to Buyer's satisfaction, including but not limited to those concerns addressed in Buyer's letter dated March 11, 2016. . . .

See ECF 217-10 at pp. 3-4 (March 17, 2016 Extension Agreement at p. 1 and ¶¶2, 3).

29.     The PSA dated November 25, 2015 as amended by the January 4, 2016 Amendment and March 17, 2016 Extension Agreement is the written-executed document by which Prime and MarcellX closed the Swamp Angel Transaction on July 21, 2016. See ECF 217-3 at pp. 11, 12 (D.T. of Prime 30(b)(6), pp. 57, 61); see also ECF 217-7, 217-9 and 217-10.

**The Indiana County Litigation Arising From the Swamp Angel Transaction**

30.     On September 20, 2016, Mid-East Oil and another company controlled by Thompson, LRD Operating, LLC ("LRD"), sued Prime in Indiana County, Pennsylvania, at No. 11373 CD 2016 (the "Indiana County Litigation"). See ECF 217-11 (Indiana County Litigation Release Agreement, appended hereto as Ex. 10); see also ECF 217-12 (Indiana County Litigation Complaint, appended hereto as Ex. 11).

31.     Mid-East Oil and LRD sued Prime based upon, *inter alia*, alleged breaches of the PSA, Participation Agreement, and Well Operating Agreements for both new and existing wells. *See* ECF 217-7 at p. 11 (PSA ¶16); *see also* ECF 217-12 (Indiana County Litigation Complaint).

32.     Tucker Arensberg represented Mid-East Oil and LRD in the Indiana County Litigation.  *See* ECF 217-12 at p. 2, 15 (Indiana County Litigation Complaint).

33.     Prime joined Thompson as a party to the Indiana County Litigation and filed a counterclaim against Mid-East Oil, LRD, and Thompson alleging Misrepresentation, Fraud, Conversion and Unjust Enrichment.  *See* ECF 217-11 at p. 3 (Indiana County Litigation Release Agreement).

34.     Prime's allegations against Thompson, Mid-East Oil, and LRD in the Indiana County Litigation are summarized as follows:

1) ***Thompson and Mid-East*** misrepresented the ownership status of the Swamp Angel lease where they claimed Mid-East was an owner with authority to convey the Lease and Wells, and where Thompson claimed that Marcell X approved the PSA prior to execution.

2) ***Thompson and Mid-East*** fraudulently misrepresented that Prime's initial deposit payments in the amount of $678,000 would be placed in Tucker Arensberg's escrow account and applied to the purchase price of the Swamp Angel Lease.

3) ***Thompson and Mid-East*** misrepresented that the Swamp Angel Lease was unencumbered, and that there was no pending or threatened litigation or governmental action concerning the Leases or Wells.

*See* ECF 217-13 (ANM and CCs Indiana County Action ¶¶84, 87-88, 186-90, 194, 205-07, 217-18, appended hereto as Ex. 12).

35.     On May 3, 2018, the parties to the Indiana County Litigation entered into a Settlement Agreement and Release pursuant to which Prime settled, dismissed, and released it counterclaims against Thompson, Mid-East Oil, and LRD.  *See* ECF 217-11 (Indiana County Litigation Release Agreement).

36.     The parties agreed *inter alia* that: (1) the PSA and all of its amendments are valid, and (2) that they will never contest: (a) the validity of the Assignment and Bill of Sale dated September 7, 2016 of the Swamp Angel Lease; (b) that Prime rightfully obtained title to and ownership in the Gathering System and Injection Well on the Swamp Angel Lease; nor (c) that Prime rightfully obtained title to and ownership of interests in the Swamp Angel Lease under Assignments.  *See* ECF 217-11 (Indiana County Litigation Release Agreement ¶9).

### Prime's Claims Against Tucker Arensberg

37.     On March 15, 2018, Prime filed this lawsuit against Tucker Arensberg alleging almost the exact same fraud allegations that it settled against Thompson and Mid-East Oil in the Indiana County Litigation.  *Compare* ECF 217-2 (Second Am. Complaint ¶¶2(i)-(iii), 19-20, 22); *with* ECF 217-13 (ANM and CCs Indiana County Action ¶¶84, 87-88, 186-90, 194, 205-07, 217-18).

38.     In this lawsuit, Prime does <u>NOT</u> allege that any provision of the PSA is ambiguous. *See generally* ECF 217-2 (Second Am. Complaint).

39.     Prime alleges, *inter alia*, that:

   a.   Tucker Arensberg misrepresented Thompson's ownership of the Swamp Angel Lease through MarcellX by concealing the Prushnok Brothers' existence;

   b.   Tucker Arensberg failed to disclose pending litigation or governmental action concerning the Leases or Wells;

   c.   $678,000 in "deposit" money was to be held in escrow by Tucker Arensberg and applied as a credit to the purchase price of the Swamp Angel Lease, but instead the $678,000 in "deposit" money was wired directly to Thompson (rather than a Tucker Arensberg account);

   d.   Thompson improperly spent the money in ways Prime alleges were contrary to the express terms of the PSA; and

   e.   Six weeks before the parties entered into the PSA Shiner told Prime the escrow account would act as a "check" to ensure Prime deposit money was "held and used in conformity with the PSA and promptly reported to Prime Energy."

*See* ECF 217-2 (Second Am. Complaint ¶¶2(i)-(iii), 4, 19).

40.     Prime admitted in discovery that its allegation regarding Shiner orally stating the escrow account would act as a "check" is completely **false**, because Shiner never said that.  *See* ECF 217-2 (Second Am. Complaint ¶19); *see also* ECF 217-4 at p. 20 (D.T. of Acunto, pp. 270-72).

**Facts Regarding Ownership of the Swamp Angel Lease**

41.     MarcellX acquired the Swamp Angel Lease via Assignment from Swamp Angel Energy, LLC on April 20, 2012.  *See* ECF 217-7 at pp. 13, 17-19 (PSA at Exhibit "A").

42.     The Assignment was recorded in McKean County on June 12, 2012 in Record Book 725, page 1049.  *See* ECF 217-7 at p. 17 (PSA, p. 16).

43.     The Lease Agreement that specifically identifies MarcellX as the owner of the Swamp Angel Lease is attached to the PSA.  *See* ECF 217-7 at pp. 13-21 (PSA at Exhibit A).

> *a.   The Prushnok Brothers knew about the sale of the Swamp Angel Lease to Prime and specifically authorized the sale*

44.     On December 18, 2015, the members of MarcellX signed a written "Resolution Adopted By All Members" that (1) identified Thompson as **member** of MarcellX; and (2) authorized Thompson to enter into and execute on behalf of MarcellX all documents and agreements necessary to effectuate the sale of the Swamp Angel Lease to Prime.  *See* ECF 217-5 (Resolution).

45.     The Resolution states in part:

> **WHEREAS, MarcellX, LLC desires to enter into that certain Purchase and Sale Agreement (the "Agreement") by and among Prime Energy and Chemical, LLC, a Florida limited liability company ("the "Buyer") and Mid-East Oil Company and MarcellX, LLC (collectively, the "Sellers")**, where the Sellers have agreed to sell all of MarcellX, LLC's right, title and interest in and to: (i) their leasehold ownership interests . . . in and underlying that certain lease . . . acquired by [MarcellX, LLC] in that certain Partial Assignment of Oil and Gas

10

Lease recorded in the office of the McKean County Recorder of Deeds in Record Book 725, page 1049 (collectively the "Swamp Angel Leasehold") . . . .

*   *   *

NOW, THEREFORE, BE IT RESOLVED and it is hereby resolved that . . . [MarcellX, LLC] is authorized to execute, deliver and effectuate the Agreement and any and all other documents, instruments and agreements required thereunder, and that Mark A Thompson, **a member** of the Company, is hereby authorized to enter into, execute, acknowledge and deliver on behalf of the Company all such documents, instruments and agreements, and that Mark A. Thompson is further authorized and directed to do all such things that are necessary or proper to accomplish the intent of this Resolution.

*See* ECF 217-5 at p. 2 (Resolution, p. 1) (emphasis added).

46.     David Prushnok reviewed the PSA **prior to** the Prushnok Brothers signing the Resolution cited *supra*. *See* ECF 217-6 at p. 8 (D.T. of David Prushnok, pp. 61-62).

47.     David Prushnok testified that he demanded to see the PSA and he reviewed it sometime in December. *See* ECF 217-6 at p. 7 (D.T. of David Prushnok at p. 54).

48.     The copy of the PSA that David Prushnok reviewed is Exhibit Prushnok 1. *See* ECF 217-6 at p. 7 (D.T. of David Prushnok at p. 54); *see also* ECF 217-14 (Prushnok Copy of PSA, appended hereto as Ex. 13) (previously marked as Prushnok 1).

49.     At the time of its acquisition of the Swamp Angel Lease, Marcell X received a loan and a line of credit from CNB Bank, and CNB Bank took a mortgage against the Swamp Angel Lease. *See* ECF 217-6 at p. 3 (D.T. of David Prushnok, pp. 10-11).

50.     The loan agreement was executed by and between MarcellX and CNB Bank, and was personally guaranteed 50% by Thompson and 50% by the Prushnok Brothers. *See* ECF 217-6 at p. 5 (D.T. of David Prushnok, pp. 46-48).

51.     As of October 2015, David Prushnok was aware that Thompson was attempting to sell the Swamp Angel Lease. *See* ECF 217-6 at p. 4 (D.T. of David Prushnok, p. 20).

52.     Prushnok testified that he wanted to get out from under the loan and personal guarantee with CNB Bank, so the members of MarcellX signed a Resolution giving Thompson authority to sell the Swamp Angel Lease.  *See* ECF 217-6 at p. 5-6 (D.T. of David Prushnok at pp. 48-50); *see also* ECF 217-15 (Confidentiality Agreement, appended hereto as Ex. 14) (previously marked as Logue 6).

### b. *Tucker Arensberg did <u>not</u> conceal the existence of the Prushnoks*

53.     On December 10, 2015, Shiner sent the following email to Thompson and, on that same date, Thompson forwarded the email to Thomas Belton ("Belton"):

> As you know, MarcellX, LLC ("MarcellX") is the assignee under the Swamp Angel/Music Mountain lease dated May 25, 2001 (Memorandum of Lease recorded in Record Book 352, page 1089) (the "Swamp Angel Lease").  By assignment recorded on June 12, 2012 in Record Book 725, page 1049, MarcellX acquired the right to a portion of the Swamp Angel Lease that includes the right to all oil and gas from the surface of the earth down to and including the Haskill Sands.  Mark A. Thompson currently owns 50% of MarcellX and has the authority to bind MarcellX to contracts.  **The other 50% of MarcellX is owned by the Prushnok Brothers.  To alleviate any doubt about Mr. Thompson's authority, in connection with the sale of . . . MarcellX's interest in the Swamp Angel Lease . . . to Prime, Mr. Thompson will acquire the Prushnok Brothers' membership interests in MarcellX at the closing of the transaction with Prime.  The sale proceeds with Prime ($3MM) will be used to repay the loans to CNB Bank that are collateralized by the Swamp Angel Lease, so that Prime will acquire good title to the Swamp Angel Lease.**  While it probably goes without saying, as 100% owner of MarcellX, Mr. Thompson will have full authority to bind MarcellX and to cause MarcellX to perform under the PSA and other related agreements.

*See* ECF 217-16 (December 10, 2015 Shiner Email, appended hereto as Ex. 15) (emphasis added) (previously marked as Acunto 30).

54.     On March 2, 2016, an extended email exchange occurred involving Acunto, Parker, Belton, Thompson and Shiner that related to "taking out" the interests of the Prushnok Brothers.  *See* ECF 217-17 (March 2, 2016 Email Exchange re Prushnok Brothers, appended hereto as Ex. 16) (bates stamped PE003409-3409.003).

55.     Shiner prepared a proposed email on Thompson's behalf, which Thompson forwarded to Belton to answer Prime's questions regarding the Prushnok Brothers' ownership interests in the Swamp Angel Lease and paying down the CNB Bank mortgage.  *See* ECF 217-17 (March 2, 2016 Email Exchange re Prushnok Brothers)

56.     Belton started out as the broker for the Swamp Angel transaction.  *See* ECF 217-18 (Sept. 2015 Fee Agreement, appended hereto as Ex. 17) (previously marked as Acunto 40).

57.     In September 2015, Thompson and Belton entered into a brokers' Fee Agreement with a Non-Circumvention, Non Disclosure clause.  *See* ECF 217-18 (Sept. 2015 Fee Agreement).

58.     The Fee Agreement provided for a commission to be paid to Belton for "raising capital to invest, own, be assigned, develop or explore oil and gas leases" on the Swamp Angel property.  *See* ECF 217-18 (Sept. 2015 Fee Agreement).

59.     The Non-Circumvention, Non-Disclosure clause prevented Thompson from circumventing Belton or dealing directly with Belton's clients.  *See* ECF 217-18 (Sept. 2015 Fee Agreement).

60.     On October 29, 2015, Belton sent an email to Thompson, attaching draft documents relating to the Swamp Angel transaction, and stating as follows:

> Please sign and return the signed document to me as soon as possible today for us to get the $436,000[sic] wired in for tomorrow's deposit.  Make sure you sign on all lines with the different companies where your signature line appears.  ***I'm now a partner with John Acunto in Prime Energy and Chemical, LLC so we are keeping the document's clean with just yours and John's signatures on all documents***.

*See* ECF 217-19 (October 29, 2015 Belton to Thompson Email, appended hereto as Ex. 18) (emphasis added) (previously marked as Acunto 9).

61.     On November 6, 2015, Belton emailed Shiner, Thompson, and Parker with the following signature line:

Thomas J. Belton III

Prime Energy & Chemical, LLC/Partner

Jupiter, Fl 33458

tbelton3@gmail.com

386-864-1973

*See* ECF 217-20 (Nov. 6, 2015 Belton Email, appended hereto as Ex. 19) (previously marked as Acunto 11).

62.     On November 20, 2015, Belton provided Acunto with a copy of his *Curriculum Vitae* wherein Belton identifies himself as "Vice President of Oil and Gas Operations" of Prime, which Acunto then forwarded to Parker.  *See* ECF 217-4 at pp. 8-9 (D.T. of Acunto pp. 92-93); *see also* ECF 217-21 (Nov. 20, 2015 Email Chain with Belton Resume Enclosed, appended hereto as Ex. 20) (previously marked as Acunto 8).

63.     Belton's CV states as follows:

PRIME ENERGY & CHEMICAL, JUPITER, FL                    *June 2012 to Present*
**Vice President of Oil and Gas Operations**
Responsible for all oil and gas field operations, coordination, initial oil and gas contract negotiations, inventory, lease verification,, survey, title search  prior to, during and after the sale of all oil and gas projects world-wide. To include but not limited to operations, inventories, above and below ground, coordination of all permits, certifications, leases, etc. More specifically, first and foremost verification of all requested documents, all books, files, maps, records and reports (including electronic data files that would not violate any license or law) pertaining primarily to the Leases and Wells, including, but not limited to, inspection reports, payment records, production reports, logs, and/or reports and filings to any state or federal agency (collectively, the "Records") before during and after signing of the documents and contracts.

*See* ECF 217-4 at pp. 8-9 (D.T. of Acunto pp. 92-93); *see also* ECF 217-21 (Nov. 20, 2015 Email Chain with Belton Resume Enclosed).

64.     Acunto acknowledged at deposition that he had given Belton the title of Vice President of Oil and Gas Operations of Prime, and authorized Belton to hold himself out to third persons as such.  *See* 217-4 at pp. 9-10 (D.T. of Acunto, pp. 93-99 (stating, "I gave him the title" and "yes" in response to being asked if he "allowed [Belton] to hold himself out to third persons" as an officer of Prime).

65.     Belton demanded that all communications with Prime go through him.  *See* ECF 217-22 (Jan. 4, 2016 Belton Email directed to Thompson and stating, "It is understood and agreed to between you me, John Acunto and Russell Parker that all communications either by phone, e mail, text etc. go directly through me without exception", appended hereto as Ex. 21) (bates stamped PP2-00005184-5185).

### Facts Regarding the Alleged $678,000 in "Deposit Money"

66.     The $600,000 amount referenced in paragraph two of the PSA was paid via wire transfer as follows.  The $165,000 (non-refundable) was paid in three (3) installments:

- $50,000 paid by Parker Reed Corporation on October 16, 2015;
- $50,000 paid by Parker Reed Corporation on October 21, 2015; and
- $65,000 paid by Lucas Corporation on October 21, 2015.

*See* ECF 217-4 at p. 6 (D.T. of Acunto, pp. 79-80); *see also* ECF 217-3 at pp. 4-6 (D.T. of Prime 30(b)(6), pp. 14-22).

67.     The "additional $435,000" was paid by Lucas Corporation on December 31, 2015. *See* ECF 217-3 at p. 6 (D.T. of Prime 30(b)(6), pp. 21-22).

### a.   *Shiner never gave Prime written or verbal wiring instructions*

68.     The above-cited payments totaling $600,000 were wired by Parker Reed Corporation and Lucas Corporation pursuant to written wiring instructions ***provided by Belton*** to Acunto on October 10, 2015 at 3:10PM.  Belton wrote to Acunto:

> Attached please find the routing numbers to send to Russell for all deposits and disbursements of funds for the $50,000 deposit on Wednesday and all future deposit of funds.

> Also please find the executed copy of all three written signatures.

*See* ECF 217- 4 at p. 5 (D.T. of Acunto, pp. 69-71); *see also* ECF 217-23 (Oct. 10, 2015, 3:10PM Email from Belton to Acunto, appended hereto as Ex. 22) (previously marked as Acunto 3).

69.     Per this email, Belton attached an executed, one-page Letter of Intent[1] signed by Acunto, Thompson and Belton in addition to another document, which set forth account numbers to which disbursements were to be made.  *See* ECF 217-23 (Oct. 10, 2015, 3:10PM Email from Belton to Acunto).

70.     This separate document (bates stamped "PE004003") states:

> Tucker Arensberg
>
> Mike Shiner Attorney
>
> Mid East Oil Company
>
> Mark A.Thompson
>
> S@T Bank 800 Philadelphia Street, Indiana,Pa. 15701
>
> Routing Number ▮▮▮▮▮   Account ▮▮▮▮▮

ECF 217-4 at p. 5 (D.T. of Acunto, pp. 69-72); *see also* ECF 217-23 (Oct. 10, 2015, 3:10PM Email from Belton to Acunto).

71.     Shiner did not provide the above referenced account information to Acunto, nor did Shiner provide that information to Belton or Thompson. *See* ECF 217-23 (Oct. 10, 2015, 3:10PM Email from Belton to Acunto).

72.     Shiner was <u>not</u> even copied on this Saturday, October 10, 2015, 3:10 PM email from Belton.  *See* ECF 217-23 (Oct. 10, 2015, 3:10PM Email from Belton to Acunto).

73.     There is no evidence, either testimonial or in writing, that establishes Shiner provided the account information.

74.     What the record does show is that hours earlier, on Saturday, October 10, 2015 at 10:59AM, Belton emailed Thompson and Acunto forwarding a copy of the LOI signed only by Acunto and Belton.  *See* ECF 217-24 (October 10, 2015, 10:59AM Email, appended hereto as Ex. 23) (previously marked as Shiner 9).

---

[1] The executed LOI is appended hereto as part of Exhibit 22 – i.e., the October 10, 2015, 3:10PM Email.

75.     Belton requested Thompson to "sign and return the LOI" to him.  *See* ECF 217-24.

76.     He also requested Thompson to "forward . . . your attorney's name, bank account, and routing numbers for the first initial deposit of $50,000 on Wednesday 10/14/15."  *See* ECF 217-24.

77.     Thompson then forwarded Belton's October 10, 2015, 10:59AM email to Shiner on Saturday, October 10, 2015 at 11:24AM.  *See* ECF 217-24.

78.     Shiner did <u>not</u> respond to Thompson's message until Saturday, October 10, 2015 at 8:42PM.  *See* ECF 217-24.

79.     Shiner did not send Thompson any wiring information in response to his October 10, 2015, 11:24AM forwarding email.  *See* ECF 217-24.

80.     Rather, Shiner merely stated, "This is awfully bare bones, but I gotta say I like the numbers.  Let's discuss on Monday."  *See* ECF 217-24.

81.     It was in between the time that Thompson forwarded Belton's October 10, 2015, 10:59 AM email to Shiner at 11:24AM and the time that Shiner responded to that email at 8:42PM stating, "Let's discuss on Monday", that Belton sent the October 10, 2015 3:10PM email to Thompson and Acunto containing the account information and routing number.  *See* ECF 217-24; *see also* ECF 217-23.

82.     When specifically questioned about Belton's October 10, 2015, 3:10PM email, Acunto testified as follows:

> Q: Let's look at the routing information on PE4003.  I'm right that this doesn't specifically say that this is Tucker Arensberg or Mike Shiner's escrow account; does it?

*     *     *

> A: Well, the beginning at these – we bring it up at the beginning again.  That the signed LOI three parties, Mike Shiner Attorney for Mid-East Oil, routing and account number for deposits.

Q: You're referring to the subject of the e-mail.  I'm referring to PE4003.  I'm asking you PE4003 doesn't say that – specifically say that that's Mike Shiner's or Tucker Arensberg's escrow account, the account that's listed there; does it?

A: I have to tell you, I would have thought by looking at that that was Mike Shiner and Tucker Arensberg's account we were sending the money for deposit.  That's all I'm trying to say.

Q: ***You would have only thought that because of what Tom Belton told you in the subject of the e-mail; right***?

A: Yeah.

Q: ***Mike Shiner didn't tell you that this was his account; did he***?

A: ***No***.

Q: ***Tucker Arensberg didn't tell you that this was their escrow account; did they***?

A: ***No***.

Q: In fact, you hadn't even spoken to Mike Shiner prior to this LOI; did you?

A: No.

Q: ***Have you ever spoken to Mike Shiner***?

A: ***No***.

*See* ECF 217-4 at p. 5 (D.T. Acunto, pp. 71-72) (emphasis added).

83.    Furthermore, Prime has **admitted** that its allegation in paragraph 20 of its Second Amended Complaint that Shiner gave it *verbal* wiring instructions is completely **false**.  *See* ECF 217-4 at pp. 21-22 (D.T. Acunto pp. 273-74, 288); *see also* ECF 217-8 at pp. 7-8 (D.T. of Parker, pp. 164-165).

84.    Indeed, both Acunto and Parker admitted that they **never** spoke to Shiner during the transaction.  *See* ECF 217-4 at pp. 20-22 (D.T. Acunto pp. 270-74, 288); *see also* ECF 217-8 at pp. 7-8 (D.T. of Parker, pp. 164-165).

85.    Acunto testified as follows:

Q.      So if you move on it says in the six weeks preceding the November 25, 2015 execution of the PSA Shiner purporting to act on behalf of MarcellX, Mid-East, Tucker Arensberg and himself represented to and assured John Acunto of Prime Energy that the use of the attorney's escrow account would act as a check to ensure that the Prime Energy deposit money was held and used in conformity with the PSA and properly reported to Prime Energy.

Mr. Shiner never told you that; did he?

A.      **It was stated through the broker and through Mark Thompson** . . . .

Q.      So once again, sir, you testified earlier that you had never spoken to Mike Shiner prior to that LOI or at any time.  So he never represented to you, John Acunto, that the use of the attorney's escrow account would act as check to ensure that the Prime Energy deposit money was held and used in conformity with the PSA and properly reported to Prime Energy, did he?

A.      <u>**Not from Mike Shiner**</u>, but from either our broker who spoke to Mike Shiner and/or Mark Thompson who spoke to Mike Shiner on a regular basis. . . .

*       *       *

Q.      **Once again, Mike Shiner didn't say what you allege he said in Paragraph 19 of the Second Amended Complaint.  He didn't say that to you because you testified that you had never spoken to Mike Shiner; isn't that true?**

A.      **That's true.**

Q.      Then in Paragraph 20 its says Defendants through Shiner and Carroll then gave Prime Energy wiring instructions verbal and in writing for the $600,000 deposit to go into an account which they represented to be Tucker Arensberg attorney escrow account in the name of Shiner. . . .

*       *       *

Q.      Once again, Mike Shiner never verbally gave you any wiring instructions as alleged in Paragraph 20 of the Second Amended Complaint because he never spoke to you?

*       *       *

A.      Yeah. . . . we got information from him through the e-mails, ***but not verbally because I never spoke to the man***.

*See* ECF 217-4 at pp. 20-21 (D.T. of Acunto, pp. 270-74) (emphasis added).

       **b.  *Prime <u>knew</u> that the $600,000 was sent directly to Thompson***

86.     Prime's bank statements from October 2015 and December 2015 specifically informed Prime that the above-referenced S&T Bank account (i.e., to which payments totaling $600,000 were made via wire transfer) was owned by Mid-East Oil (not Tucker Arensberg).  *See* ECF 217-25 (PE Bank Statements, appended hereto as Ex. 24) (previously marked as PE 3).

87.     In the spirit of their partnership, Prime shared the commission payments due to Belton under the brokers' Fee Agreement between Belton and Thompson.  *See* ECF 217-4 at pp. 7, 11 (D.T. of Acunto, pp. 86, 101).

88.     Belton and Prime struck a deal pursuant to which Prime received half (3%) of the 6% commission payments paid to Belton under his broker's Fee Agreement with Thompson and Mid-East Oil.  *See* ECF 217-4 at pp. 7, 11 (D.T. of Acunto, pp. 86, 101).

89.     Prime's bank statements show Prime's 3% portion of the commission payments being received by Prime after the $600,000 in initial "deposit" payments were made by Parker Reed Corporation and Lucas Corporation, LLC.  *See* ECF 217-3 at pp. 7-8 (D.T. of Prime 30(b)(6), pp. 27-29); *see also* ECF 217-25 (PE Bank Statements).

90.     The specific entries on Prime's bank statements reflect that it received commission payments wired from Mid East Oil's bank account at S&T Bank, Account number ▮▮▮▮ and routing number ▮▮▮▮▮.  *See* ECF 217-25 (PE Bank Statements).

91.     **This is the exact same account that Prime alleges it believed belonged to Tucker Arensberg**.  *See* ECF 217-2 (Second Am. Complaint ¶2(ii)); *see also* ECF 217-23 (Oct. 10, 2015, 3:10PM Email from Belton to Acunto).

92.     The relevant entries appear as follows:

10/19/15     WIRE TYPE: WIRE  IN DATE: 151019                                1,500.00
             TIME:1437 ET  TRN:▮▮▮▮▮▮▮▮
             SEQ:▮▮▮▮▮▮▮▮▮
             **ORIG:MID EAST OIL CO**



**ID:** ▮▮▮▮▮   **SND BK:S & T BANK**
**ID:** ▮▮▮▮▮

10/21/15   WIRE TYPE: WIRE  IN DATE: 151021          1,500.00
           TIME:1523 ET  TRN: ▮▮▮▮▮▮▮▮▮
           SEQ: ▮▮▮▮▮▮▮▮
           **ORIG:MID EAST OIL CO**
           **ID:** ▮▮▮▮▮   **SND BK:S & T BANK**
           **ID:** ▮▮▮▮▮

10/26/15   WIRE TYPE: WIRE  IN DATE: 151026          1,920.00
           TIME:1202 ET  TRN: ▮▮▮▮▮▮▮▮▮
           SEQ: ▮▮▮▮▮▮▮▮
           **ORIG:MID EAST OIL CO**
           **ID:** ▮▮▮▮▮   **SND BK:S & T BANK**
           **ID:** ▮▮▮▮▮

01/04/16   WIRE TYPE: WIRE  IN DATE: 160104         13,050.00
           TIME:1523 ET  TRN: ▮▮▮▮▮▮▮▮▮
           SEQ: ▮▮▮▮▮▮▮▮
           **ORIG:MID EAST OIL CO**
           **ID:** ▮▮▮▮▮   **SND BK:S & T BANK**
           **ID:** ▮▮▮▮▮

*See* ECF 217-3 at p. 8 (D.T. of Prime 30(b)(6), p. 31); *see also* ECF 217-25 (PE Bank Statements).

### c. *Prime <u>knew</u> that Thompson spent the $600,000 and it was not sitting in "escrow" to be applied to the purchase price*

93.     On January 18, 2016, Thompson emailed Belton, with a copy to Acunto and Parker, attaching photos of work that was being performed on the Swamp Angel Lease along with an "Operational Report".  *See* ECF 217-26 (Jan. 18, 2016 Thompson email re Operational Report, appended hereto as Ex. 25) (previously marked as Acunto 22).

94.     Later that same day, Acunto received an email from Belton with the subject line "Expenses" advising that substantially all of the $600,000 referenced in paragraph 2 of the PSA had been spent:

> John,
>
> Here is the list of expenses to date of the draw against he[sic] $600K.  Mark has the back-up receipts for all expenses if you need them or want them included in the report.  We can review then when we go to PA or I can get them before that trip if you want.

> **_The $13,004.87 the last number at the bottom of the page is what's left in the escrow account today that has not been spent_**.

*See* ECF 217-4 at pp. 12-15 (D.T. of Acunto, pp. 166-179); *see also* ECF 217-27 (Jan. 18, 2016 Email from Belton to Acunto, appended hereto as Ex. 26) (emphasis added) (previously marked as Acunto 23).

95.     Parker and Acunto acknowledged being informed on or about January 18, 2016 that all but approximately $13,000 of the "deposits" had been spent.  *See* ECF 217-4 at p. 14 (D.T. of Acunto, pp. 173-75); *see also* ECF 217-8 at pp. 4-5, 6 (D.T. of Parker, pp. 96-98, 101, 102).

96.     Acunto specifically testified as follows:

Q.     So on -- you say that you probably had a conversation with Tom Belton on January 18, 2016 with regard to the contents of the January 18, 2016 e-mail that we are looking at as Exhibit 23?

A.     Yeah.

Q.     Is that what you're sayin?

A.     I don't know.  I don't recall.

Q.     This was a big deal; wasn't it?

A.     **_You're damn right it was a big deal_**. . . .

    Why am I paying again labor cost to Mid-East Oil?  Why am I paying for surveys that were done for new well locations when we haven't even talked about new well locations?  Why am I paying for pump jacks that we didn't buy? . . .

    Like I said, I questioned all of it on here and it was only a couple weeks after we got the $435,000 in place and all of the sudden we got this stuff.  Hey, and they didn't discuss it with us until they sent us a list of this stuff.

*See* ECF 217-4 at p. 14 (D.T. of Acunto, pp. 173-75) (emphasis added); *see also* ECF 217-4 at pp. 12-15 (D.T. of Acunto, pp.166-179) (for complete testimony).

97.     Although Parker was not copied on the email, he testified that he was apprised of the matter:

Q.      My question is this, as of the date, January 18, you were -- Prime Energy and Chemical, LLC was aware that all, but $13,000 of the $600,000 that Prime Energy believed was in the escrow account was spent?

A.      I was furious when I saw this.

                              *      *      *

A.      I said to John how the hell did this happen.  That money was supposed to be residing in the escrow account and we were supposed to get authorized expenses and a budget and we never received any of that.

        Now I can tell you, counselor, you want to see fraud, see the third up 24,000 feet of four inch plastic pipe, $60,000, Mark Thompson never owned that.  That went with the property.  So he's talking about, oh, we spent $60,000 on pipe.  He did not.  Let's go to the very top.  Kitlinger locations, done for Horizontal, not for Prime's benefit, $145,000.  Let's talk about these surveys.  Nothing to do with our property.

                              *      *      *

**Q.      Prime Energy and Chemical on January 18, 2016 was aware that all but, $13,000 of the $600,000 that Prime Energy believed was in an escrow account had been spent by Mark Thompson?**

**A.      Had been spent by Mark Thompson through the escrow account where the money should have been residing Tucker Arensberg.**

**Q.      Is that a yes?**

**A.      Yes.**

                              *      *      *

**Q.      On January 18, 2016, Prime Energy and Chemical, LLC was aware that the $600,000 that they believed was residing in an escrow account was not in fact residing in an escrow account, isn't that true?**

**A.      That is true.  With no proof of anything.  I just have a list here of supposed expenses which were not authorized.**

                              *      *      *

**Q.      So on January 18, 2016, you believed that Mr. Shiner was perpetrating a fraud on you, didn't you?**

**A.      He sure did.**

**Q.      And you didn't even call him?**

23

**A.** **He's not our counsel.  How am I going call to an attorney --**

*See* ECF 217-8 at pp. 4-5, 6 (D.T. of Parker, pp. 96-98, 101, 102) (emphasis added).

98.     On January 20, 2016, Belton emailed Acunto, Thompson and Shiner requesting a "narrative and receipts" to justify how the $600,000 in "deposit" money was spent.  *See* ECF 217-28 at p. 9 (Belton Feb. 3, 2016 Email Attaching Jan. 20, 2016 Email, appended hereto as Ex. 27) (previously marked as Acunto 25).

99.     On February 3, 2016, Thompson's associate, Brad Brothers, sent Acunto an email response summarizing spending of deposit money, and identifying work that still needed to be performed.  *See* ECF 217-29 (Feb. 3, 2016 Email Summary, appended hereto as Ex. 28) (previously marked as Acunto 24).

100.     Shiner was not copied on this February 3, 2016 email.  *See* ECF 217-29 (Feb. 3, 2016 Email Summary).

### d.   The $78,000 payment

101.     The $78,000 payment was made by Dr. John Battilana on February 24, 2016.  *See* ECF 217-3 at p. 9 (D.T. of Prime 30(b)(6), p. 38); *see also* ECF 217-4 at p. 17 (D.T. of Acunto, p. 213).

102.     Thompson had requested $120,000 from Prime - $78,000 to make a payment on the CNB Bank mortgage and $40,000 to "Cap/Ex drilling and labor costs."  *See* ECF 217-4 at p. 16 (D.T. of Acunto, pp. 197-199).

103.     On February 19, 2016, Belton sent the following email to Acunto, Thompson, and Shiner stating in pertinent part:

> Acknowledging the closing date has been moved from 11/31/15 and still has not closed as of today, **due to historical dollar decreases in oil pricing, market vulnerability, a moratorium set on all new deals with the multi-billion oil/energy company we are working with**, Prime Energy has done an exceptional job keeping the transaction alive.

John Acunto has put up his oil field in West Virginia as collateral of $2M, **Russell Parker and John Acunto are responsible to repay the $600,000 non-refundable deposit**, they made in good faith, and now have committed to use their own money to advance another $120,000 to Mid-East.  **It is understood that the $120,000 will be used to pay Cap/Ex drilling and labor costs ($40,000) as well as the note to the bank ($78,000.)**

The irony in all this is **why hasn't the bank note and the Cap/Ex been paid out of the $600K that has already been given as a non-refundable deposit**?

**That being said, <u>Russell, John and I</u> have agreed to fund another $120,000 as requested.**  I will re-pay the $7200 in commission back to Mid-East as soon as it is received in my account.

*     *     *

> Thomas J. Belton III
> Vice President, Oil Field Operations
> Prime Energy and Chemical, LLC.
> tbelton3@gmail.com
> 386-864-1973

*See* ECF 217-4 at p. 16 (D.T. of Acunto, pp. 197-199); *see also* ECF 217-30 (Feb 19, 2016 Belton Email, appended hereto as Ex. 29) (emphasis added) (previously marked Acunto 26).

104.    On February 24, 2016, Parker emailed Thompson and Acunto, asking Thompson for the name, bank, bank account number, address etc. of the account to which the $120k should be wired.  *See* ECF 217-31 (February 24, 2016 Email, appended hereto as Ex. 30) (previously marked as Acunto 27).

105.    Later that day, Thompson's colleague, Brad Brothers, emailed Parker identifying *Mid-East as the holder of the account to which funds should be wired*:

> Russell,
> Please find the instructions to send the wire to our bank.  Mark asks if you would send a confirmation e-mail once the wire has been sent.
> Thanks you
> Brad
>
> Receiving Bank:          S&T Bank
>                          800 Philadelphia Street
>                          Indiana, PA 15701

ABA Routing Number: ████████

***Account Holder:***        ***Mid-East Oil Company***
418 Gompers Avenue
Indiana, PA 15701

***Account Number***      ████████

*See* ECF 217-31 (February 24, 2016 Email).

106.      This is the same account to which ***non-parties had previously wired the initial $600,000 in "deposits"*** on the transaction - i.e., the account which Prime claims to have believed was Tucker Arensberg's "escrow account." *See* ECF 217-4 at p. 17 (D.T. of Acunto, p. 215).

107.      Acunto provided the following testimony on this matter:

A.    Had I seen this -- had I seen this and matched it up with our wire instructions of all the other wires, ***I would have screamed fraud right from the beginning***, but I didn't. And I used the -- I used the information I got from the LOI and sent that. That's why it came out that way. And I was not party to getting this. I never saw this.

*See* ECF 217-4 at p. 17 (D.T. of Acunto, p. 215) (emphasis added).

108.      Thompson received $78k instead of $120k as promised, so he paid $39k to CNB Bank. *See* ECF 217-3 at p. 9 (D.T. of Prime 30(b)(6), pp. 38-39).

109.      Shiner told Thompson to advise Prime the balance of the $78k payment was used to pay CapEx costs and inform Prime that, "The wire transfer was sent to Mid East Oil, not Mr. Shiner's trust account." *See* ECF 217-32 (March 2, 2016 Email, appended hereto as Ex. 31) (previously marked as Shiner 119).

## The Facts Show that Prime was Aware of the Pending Litigation

110.      Prime performed a title search in or about the Spring of 2016. *See* ECF 217-33 (Hellwig Land Title Opinion dated July 1, 2016, appended hereto as Ex. 32) (bates stamped PE0000792-PE000817).

111.    Acunto testified that "Adam Hellwig" was retained in "[l]ate March of 2016" to perform a title search, because "we weren't taking anybody's word for it at that point in time. We wanted our lawyer to handle it."  *See* ECF 217-4 at p. 18 (D.T. Acunto at p. 250).

112.    Prime's title search revealed: (1) MarcellX as the owner of the Swamp Angel Lease, (2) the CNB Bank mortgage, (3) a lawsuit filed against Thompson and MarcellX amongst others in the United States District Court of Kansas at Case No. 2:14 CV-02189 (the "*Frickey*" matter), (4) a lawsuit filed against Thompson and MarcellX amongst others in the United States District Court for the Western District of Pennsylvania at Case No. 2:14 CV-00866 (the "*Sbarra*" matter), and (5) "environmental issues" identified through "Pennsylvania's Department of Environmental Protection [(DEP)] eFacts website".  *See* ECF 217-33 at pp. 2-7 (Hellwig Land Title Opinion at pp. 1-6).

113.    Prior to closing on the Swamp Angel Transaction, Prime received an indemnity agreement (dated March 17, 2016 and signed on July 21, 2016) from MarcellX against any liability exposure arising from the *Sbarra* litigation, and the *Frickey* litigation settled with no adverse effects on the assets of the Swamp Angel Lease.  *See* ECF 217-4 at p. 19 (D.T. of Acunto at pp. 257-260).

114.    The claims asserted in *Sbarra* sought monetary damages and/or rescission of certain contracts from and with various defendants.  *See generally* ECF 217-34 (Sbarra Am. Complaint, appended hereto as Ex. 33).

115.    The *Sbarra* action settled and a consent judgment against Thompson individually and Horizontal Exploration, LLC, a company with no ownership interest in the Swamp Angel Lease, was entered.  *See* ECF 217-35 (Sbarra Motion for Consent Judgment and Order, appended hereto as Ex. 34).

116.    The *Frickey* matter resolved when the plaintiffs filed a Notice of Dismissal With

Prejudice on January 27, 2016 pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).   *See*

ECF 217-36 (Frickey Notice of Dismissal, appended hereto as Ex. 35).

117.    Accordingly, the *Frickey* matter resolved almost seven (7) months before the

Swamp Angel Transaction closed on July 21, 2016.   *See* ECF 217-36 (Frickey Notice of

Dismissal).

**Prime's Damages Allegations**

118.    Prime alleges it incurred direct losses and consequential damages in this lawsuit.

119.    Prime alleges direct losses in the following amounts:

- $678,000 of alleged "deposits": The alleged "deposits" are addressed above.

- $400,000 additional deposit to Marcell X: These alleged damages have been
  **withdrawn** by Prime.  *See* ECF 217-3 at p. 10 (D.T. of Prime 30(b)(6), pp. 41-44).

- $433,178.21 legal fees from Indiana County Litigation: These alleged damages have
  been **withdrawn** by Prime.  Prime has paid only $70,000 of this alleged amount to its
  attorneys Greenburg Truarig.  *See* ECF 217-3 at pp. 15-16 (D.T. of 30(b)(6), pp. 88-
  90).  Prime has decided to withdraw this allegation rather than producing un-redacted
  invoices from Greenburg Trauig in support of this claim.

*See* ECF 217-2 (Second Amended Complaint ¶62); *see also* ECF 217-3 at pp. 10, 15-16 (D.T. of

Prime 30(b)(6), pp. 41-44; 88-90); and ECF 217-37 (Plaintiff's Damages Statement, appended

hereto as Ex. 36) (previously marked as PE 2).

120.    Prime further alleges consequential damages in the nature of "lost profits" against

Tucker Arensberg with regard to the Swamp Angel Lease.  *See* ECF 217-2 (Second Amended

Complaint ¶¶63-65); *see also* ECF 217-37 (Plaintiff's Damages Statement).

### a.    *Prime no longer owns the Swamp Angel Lease*

121.    On March 23, 2017, less than a year after closing the Swamp Angel Transaction on

July 21, 2016, Prime assigned the Swamp Angel Lease to a wholly different entity, First American

Energy, Inc. ("FAE").  *See* ECF 217-3 at pp. 13-14 (D.T. of Prime 30(b)(6), pp. 68-69).

122.    FAE is owned by Parker, Robert Lucas, Carol Battilana, and Belton.  *See* ECF 217-3 at p. 14 (D.T. of Prime 30(b)(6), pp. 70-71).

123.    Acunto is <u>not</u> a shareholder in FAE.  *See* ECF 217-3 at p. 14 (D.T. of Prime 30(b)(6), pp. 70-71).

124.    Prime also assigned, and FAE assumed, the mortgage on the lease held by Lucas Corporation in the amount of $4,000,000.  *See* ECF 217-3 at p. 14 (D.T. of Prime 30(b)(6), pp. 69-70).

125.    FAE also assumed Prime's loan from Dr. Battilana.  *See* ECF 217-3 at p. 13 (D.T. of Prime 30(b)(6), pp. 66).

126.    Critically, Prime held onto and did <u>not</u> assign the existing wells and the "above ground inventory" acquired by Prime as part of the Swamp Angel Transaction.  *See* ECF 217-3 at p. 12-13 (D.T. of Prime 30(b)(6), pp. 64-65; 67).

127.    Prime's 2017 Federal Income Tax Returns indicate that the Assignment to FAE was valued at $3,967,364 – substantially more than Prime paid for the Swamp Angel Lease ***and*** other assets obtained through the Swamp Angel transaction.  *See* ECF 217-3 at p. 11 (D.T. of Prime 30(b)(6), p. 59).

### b. Prime was <u>*never*</u> *approved for a $20,000,000 line of credit*

128.    Prime alleges that in January 2017 it was approved for a loan from Iron City Capital Funding ("Iron City") in the amount of $20,000,000 to develop the Swamp Angel Lease.  *See* ECF 217-3 at p. 17 (D.T. of Prime 30(b)(6), p. 132); *see also* ECF 217-2 (Second Amended Complaint ¶63B).

129.    Prime alleges that the alleged loan from Iron City was "cancelled" because of the Indiana County Litigation filed by Tucker Arensberg on behalf of their clients, Mid-East Oil and LRD.  *See* ECF 217-3 at p. 18 (D.T. of Prime 30(b)(6), p. 143).

130.    However, Anthony Salm, the representative of Iron City that was working with Prime, testified that at no time was Prime ever approved for a line of credit from Iron City or any other entity.  *See* ECF 217-38 at p. 5 (D.T. of Anthony Salm, pp. 17-18, appended hereto as Ex. 37).

131.    Iron City did not even have a "balance sheet" and did not lend money.  *See* ECF 217-38 at p. 3, 5 (D.T. of Anthony Salm, pp. 11-12, 18-19).

132.    As Iron City did not at any time even contemplate lending money to Prime, let alone $20 million, Mr. Salm testified that it obviously did not cancel any line of credit.  *See* ECF 217-38 at p. 5 (D.T. of Anthony Salm, pp. 19).

133.    Iron City was not a lender and did not have money to lend.  *See* ECF 217-38 at p. 5 (D.T. of Anthony Salm, pp. 18-19).

134.    Rather, Iron City essentially acted as a broker: it was engaged by Prime to "shop" to potential lenders a "TermSheet" with proposed parameters of a financing arrangement.  *See* ECF 217-38 at p. 3, 5-6 (D.T. of Anthony Salm, pp. 12, 20-21).

135.    Mr. Salm testified this was a highly "complex" and difficult financing arrangement for several reasons.  *See* ECF 217-38 at p. 7-8 (D.T. of Anthony Salm, pp. 25-30).

136.    First, limited money was available for oil and gas ventures following the "oil crash" that began in the 2015-2016 timeframe.  *See* ECF 217-38 at pp. 8-9 (D.T. of Anthony Salm, pp. 31-33).

137.    Mr. Salm defined "oil crash" not based on the price of oil, per se, but in terms of impact on lender portfolios.  *See* ECF 217-38 at pp. 11, 14 (D.T. of Anthony Salm, pp. 42, 89-92).

138.    He testified lenders in the oil and gas space were generally experiencing a loss of 3-5% and there was thus limited appetite for lending or investment in oil and gas ventures during

the relevant timeframe – particularly where, as here, the entity seeking financing had no proven track-record of generating revenue.  *See* ECF 217-38 at pp. 7, 8-9, 14 (D.T. of Anthony Salm, pp. 25-28, 31-35, 89-92).

139.    Since Prime did not have any established record of generating revenue, no public bank would loan Prime millions of dollars.  *See* ECF 217-38 at p. 9 (D.T. of Anthony Salm, pp. 35-36).

140.    Mr. Salm noted that public banks are heavily regulated and would need records to audit to evaluate Prime's debt-to-income ratio and other aspects of its operation before approving a loan.  *See* ECF 217-38 at pp. 7, 11 (D.T. of Anthony Salm, pp. 27-28, 41).

141.    Mr. Salm stated that he had always told Prime that this thus needed to be a "two-part takedown."  *See* ECF 217-38 at p. 8 (D.T. of Anthony Salm, p. 29).

142.    First, they would have to find a private lender to "bet" on Prime's ability to produce oil with a $5 million investment (e.g. in return for equity).  *See* ECF 217-38 at pp. 7-8 (D.T. of Anthony Salm, pp. 28-29).

143.    That capital would be used to re-work wells and operate the field.  *See* ECF 217-38 at pp. 7-8 (D.T. of Anthony Salm, pp. 28-29).

144.    If, after 2-3 years, Prime had established a record of generating revenue, then it could seek an additional $15 million from a bank.  *See*. ECF 217-38 at pp. 7-8, 11, 12-13 (D.T. of Anthony Salm, pp. 27-30, 41, 57-61).

145.    Salm testified that Iron City never got an approval from a private individual to loan Prime the initial $5 million needed.  *See* ECF 217-38 at pp. 9-10, 12-13 (D.T. of Anthony Salm, pp. 35-36, 37-38, 57-61).

146.    Attached hereto is a timeline of critical events.  *See* ECF 217-1 (Timeline of Critical Events, appended hereto as Ex. 1A).

WHEREFORE, Defendants, Tucker Arensberg, P.C. and Michael A. Shiner respectfully submit this Concise Statement of Material Facts in Support of Motion for Summary Judgment.

| Respectfully submitted, | Respectfully submitted, |
|---|---|
| */s/ Edwin A. Schwartz* | */s/ Scott R. Eberle* |
| Edwin A. Schwartz, Esquire | Scott R. Eberle, Esquire |
| Pa. I.D. No. 75902 | Pa. I.D. No. 89044 |
| | |
| *Attorneys for Defendants* | *Attorneys for Defendants* |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the within Defendants'
Revised Concise Statement of Material Facts in Support of Motion for Summary Judgment was
served upon all counsel of record via the Court's electronic filing system on March 13, 2023.


                              BURNS WHITE LLC


                   By:    <u>*/s/ Scott R. Eberle, Esquire*</u>
                          Scott R. Eberle, Esquire
                          PA ID No. 27937

                          *Attorneys for Defendants*