**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PRIME ENERGY AND CHEMICAL, LLC,   )
                                         )

        Plaintiff,              )     Civil Action No. 18-345
                                         )     Magistrate Judge Maureen P. Kelly

         v.                  )
                                         )     Re: ECF No. 212/250

TUCKER ARENSBERG, P.C., and      )
MICHAEL A. SHINER,           )
                                         )

        Defendants.       )

## <u>OPINION</u>

**KELLY, Magistrate Judge**

       Plaintiff Prime Energy and Chemical, LLC ("Prime") brings this action against Tucker Arensberg, P.C. ("Tucker") and Michael Shiner ("Shiner"), a Tucker attorney and shareholder (collectively, "Defendants").[1] ECF No. 50. Prime alleges it sustained losses because of Defendants' misconduct while representing a third party in the attempted sale of the Swamp Angel/Music Mountain ("Swamp Angel") oil and gas lease in McKean County, Pennsylvania. <u>Id.</u> Prime asserts claims against Shiner for fraud and reckless misrepresentation and claims against Tucker for negligent supervision and liability pursuant to the doctrine of respondeat superior.

       Presently before the Court is Defendants' Motion for Summary Judgment. ECF No. 212. Defendants contend that: (1) Prime's claims are time-barred by the applicable statute of limitations; (2) Prime cannot prove a prima facie fraud claim; (3) Prime cannot prove it sustained damages caused by Tucker's conduct; and (4) Prime's settlement and release of claims against

---

[1] The parties stipulated to discontinue this action without prejudice as to Defendant Kenneth L. Carroll, a former Tucker associate. ECF No. 62.

Defendants' client effectively releases Defendants from any liability. ECF No. 218. Because the

applicable statute of limitations bars this action, the motion will be granted.[2]

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the facts taken from the record are either undisputed as stated by

the parties, or not fairly disputed on the record.[3]

---

[2] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of final judgment, with direct review by the United States Court of Appeals for the Third Circuit if an appeal is filed.   ECF Nos. 10 and 11.

[3] Prime's briefs and its Response to Defendants' Concise Statement of Material Facts in large part lack citations to record evidence to support many of its assertions or denials of fact. ECF Nos. 233, 234, 239. Citation to record evidence is required by both Federal Rule of Civil Procedure 56(c)(1)(A) and Local Civil Rule 56.B.1. The Court's recourse is set forth in Federal Rule of Civil Procedure 56(e): "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: … (2) consider the fact undisputed for purposes of the motion." The Court may also disregard unsupported factual assertions in resolving the motion. Alternatively, the Court may invoke Federal Rule of Civil Procedure 56(e)(1) to "give [the parties] an opportunity to properly support or address the fact [asserted]."

Given that Prime filed over 1,350 pages of exhibits in opposition to the pending motion, the Court instructed Prime to refile its briefs and responsive statements of fact to add citations to the record. ECF No. 249. Prime substantially failed to heed the Court's instructions and thereby made review of its arguments in opposition to summary judgment unduly burdensome. Prime reasons that much of its argument is based on inferences that don't require evidentiary support, see ECF No. 262 at 4. Yet such inferences must be reasonably supported by the record. See, e.g., Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014) (holding that an inference based on speculation or conjecture does not create an issue of material fact sufficient to survive summary judgment).

As to the substance of the pending motion, Prime bears the burden of proof on exceptions to the running of the statute of limitations. Thus, where Defendants asserted facts related to the timing of actual or constructive knowledge of an injury, Prime's failure to provide record citation to support its denials rendered review of its arguments difficult. The United States Court of Appeals for the Third Circuit has observed that, "'Judges are not like pigs, hunting for truffles buried in' the record." Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006), as amended (May 5, 2006) (quoting Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys., 309 F.3d 433, 436 (7th Cir. 2002) and quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)). In Doeblers, a plaintiff's "near-complete reliance on its 'Concise Statement of Undisputed Facts' does not fulfill the court's requirement for citations to the appendix, particularly considering that it is the movant who carries the burden of showing a lack of disputed material facts." Id. (citing Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996) (party moving for summary judgment bears burden to show the absence of genuine issues of material fact)). Thus, pursuant to Rule 56(e), when Defendants point to evidence that leaves no room for an opposing reasonable inference in favor of Prime and Prime has failed to cite to opposing evidence, the Court has disregarded Prime's denials. See Perkins v. City of Elizabeth, 412 F. App'x 554, 555 (3d Cir. 2011) (at the summary judgment stage, a party charged with the burden of proof that fails to support its claims with adequate citations to the record risks "having those claims rejected.").

### A.  Swamp Angel Lease Ownership and Potential Sale to Prime

On April 20, 2012, the Swamp Angel Lease was acquired by MarcellX, LLC ("MarcellX") and was recorded with McKean County, Pennsylvania on June 12, 2012. ECF No. 253 ¶ 2; ECF No. 255 ¶¶ 41 - 42. Defendants' client Mark A. Thompson ("Thompson") owned fifty percent of MarcellX, and David M. Prushnok, with his brothers George D. Prushnok, and John D. Prushnok ("Prushnoks") owned the other fifty percent. ECF No. 219-15 at 6. At the time MarcellX acquired the Swamp Angel Lease, it received a $3 million dollar mortgage loan and a separate line of credit from CNB Bank. ECF No. 213 ¶ 49; ECF No. 250 ¶ 49.[4] The loan agreements were personally guaranteed fifty percent by Thompson and fifty percent by the Prushnoks, and recorded with McKean County on November 16, 2012 at Book 741, pages 461 and 491. ECF No. 219-15 at 7; ECF No. 250 ¶ 50; ECF No. 217-33 at 3-4.

In December 2014, the Prushnoks sought to increase capital or loan obligations for MarcellX operations. ECF No. 219-5 at 6; ECF No. 217-6 at 4. As reflected in a Membership Assignment Agreement executed on December 15, 2014, Thompson opted not to incur any additional financial obligations and so assigned his shares in MarcellX to the Prushnoks. Id. Despite assigning his shares, Thompson retained liability for fifty percent of the CNB Bank loans as well as fifty percent of any environmental liability or plugging obligations arising out of past operations. ECF No. 219-5 at 7, 9. The parties agreed that in the event MarcellX assets were sold, the proceeds of any sale would be applied first to the CNB Bank loans. Id. at 7-8.

---

[4] Prime's response to Defendants' Concise Statement of Material Facts omits several of Defendants' assertions of fact or does not respond to certain factual allegations, including Defendants' summary of the terms of the CNB Bank mortgage. See e.g., ECF No. 250 ¶ 49; ECF No. 255 ¶¶ 47-50 (omitting paragraph 49). The Court construes Prime's failure to respond to any assertion of fact with supporting evidence of record as a concession that the allegation is not disputed.

As of October 2015, David Prushnok knew that Thompson was attempting to sell the Swamp Angel Lease. ECF No. 217-6 at 5; ECF No. 233 ¶ 49. At the time, David Prushnok was "interested in getting out from under the [CNB Bank] loan," and was "willing to allow [Thompson] to pursue a potential buyer for the Swamp Angel lease." ECF No. 217-6 at 6.

In aid of a potential sale, Thompson and Mid-East Oil LLC ("Mid-East Oil") contracted with Tom Belton, principal of Capital III Investments Oil & Gas, Inc ("Capital III"). ECF No. 219-5 at 4-6. The agreement permitted Belton to promote the sale of the lease and future gas and oil operations to Capital III clients in exchange for 6% of the proceeds of both the $3,000,000 lease sale price and the $6,546,000 development cost to be raised by Capital III. Id. The terms of the agreement forbade Thompson from dealing directly with Capital III's clients. Id.

Belton presented the proposed Swamp Angel deal to Prime principals John Acunto and Russell Parker. As memorialized in a letter of intent ("LOI") executed on October 10, 2015, Prime agreed to the rough outlines of the purchase. ECF No. 210-1 at 2; ECF No. 219-2 at 2.

### B. Letter of Intent and Initial Payments

It is not disputed that the October 2015 LOI between Prime, Mark Thompson (as principal for Mid-East Oil), and Thomas J. Belton was not drafted by Shiner or Tucker. The terms reflect that Prime would purchase the Music Mountain and Swamp Angel leases for $3,000,000 and provide an additional $6,654,000 "to rework and develop all 164 wells." ECF No. 219-1 at 2. The parties also agreed that Mid-East Oil would consider the deal "contracted and consummated" if a deposit of $50,000 was received by October 14, 2015. The transactions at issue would be reserved with additional deposits of $550,000 paid over the next two weeks. Closing was to occur on or about November 30, 2015, with payment of $9,054,000 "after due diligence [is] completed." Id.

4

On October 10, 2015, Belton forwarded a copy of the signed LOI to Thompson and requested that Thompson "forward to me as soon as possible your attorney's name, bank account and routing numbers for the first initial deposit of $50,000 on Wednesday 10/14/15." ECF No. 219-2. Belton added the instruction that Thompson "[p]lease scan, sign and return the LOI attached to me as soon as possible so we can get the deposit wired to Mid-East Oil's attorney account by Wednesday 10/14/15." Id.

Thompson forwarded this email to Shiner on October 10, 2015. Id. In turn, Shiner forwarded Belton's email with copies of the Capital III agreement and the LOI to Tucker attorneys Kenneth Carroll and Brad Tupi, and asked Carroll to review the documents for "thoughts/questions/reactions/etc." ECF No. 219-5. Shiner also responded to Thompson, "[t]his is awfully bare bones, but I gotta say I like the numbers. Let's discuss on Monday." ECF No. 253 ¶ 4; ECF No. 217-24. Shiner did not discuss the referenced "attorney account" with Carroll, Tupi, or Thompson, and it is undisputed that Shiner never spoke with a Prime principal or representative regarding the existence and purpose of an attorney escrow account, nor did he provide Prime or Belton a bank account or routing number to any account. ECF No. 217-24; ECF No. 253 ¶ 3; ECF No. 255 ¶¶ 40. 76-77.

Later that day, Belton emailed John Acunto with the "routing numbers to send to Russell [Parker] for all deposits and disbursement of funds for the $50,000 deposit on Wednesday and all future deposit of funds." ECF No. 219-4. It is undisputed that the routing numbers were to a Thompson/Mid-East Oil account. It is also undisputed that during the following weeks and months, Shiner did not correct any inference that the routing information used for deposits was to a Tucker account.

Using the account information provided to Prime by Belton, Parker Reed Corporation sent two separate $50,000 payments by wire to the Mid-East Oil account on October 16, 2015, and October 21, 2015. ECF No. 253 ¶¶ 10, 11. A third payment in the amount of $65,000 was wired to the same account on October 23, 2015, by Lucas Corporation on Prime's behalf. Id. ¶ 12.

On October 23, 2015, the Prushnoks' attorneys reached out to Shiner for a copy of the LOI in aid of a conference call with the Prushnoks and Shiner to provide "an update." ECF No. 219-11. Shiner forwarded the email to Thompson, who forbade Shiner from providing the Prushnoks with a copy of the preliminary agreement. Id.; ECF No. 253 ¶ 13.

### C. Mortgage Default

On October 26, 2015, CNB Bank advised Shiner that the Swamp Angel mortgage loans were in default. Id. ¶ 14. CNB Bank counsel requested a copy of the LOI documenting the potential sale of the property. ECF No. 219-12. The Prushnoks' attorney and Shiner requested and received cure amounts from CNB Bank to keep the mortgages current. ECF No. 219-14. A week later, CNB Bank opted to accelerate the maturity dates of the loans and demanded that all amounts due be immediately satisfied. ECF No. 219-17. Without waiving its rights, CNB Bank stated it would forbear enforcement of its rights if a payment of $80,131.63 was made by November 9, 2015. Id.

On November 5, 2015, Shiner reminded Thompson that the final deposit payment due from Prime under the LOI had not been paid. ECF No. 253 ¶ 24. Thompson forwarded Shiner's email to Belton. Id. ¶ 26. Belton responded the next day, and included Parker as a recipient. ECF No. 219-20. In the email, Belton stated that Prime would not remit the final payment until it could complete due diligence related to the existence, location, and permit numbers for the wells included in the sale. Id. Prime stated it was dissatisfied with the list and identification of wells previously

6

provided by Thompson because of inconsistencies and incomplete information. Id. at 3. Thus, the money necessary to cure the mortgages was not yet available.

### D. Purchase and Sale Agreement

Defendants prepared a Purchase and Sale Agreement ("PSA") for Thompson to complete the sale and drafted an Operating Agreement for the ongoing operation of the wells. ECF No. 219-16. The PSA, dated November 25, 2015, was executed on December 15, 2015, with a closing date set for December 22, 2015. ECF No. 255 ¶ 12; ECF No. 217-7. The parties identified in the agreement were Mid-East Oil, MarcellX, and Prime. Thompson signed on behalf of both MarcellX and Mid-East Oil. ECF No. 219-27 at 12. It is undisputed that Shiner did not disclose to Prime that as of the date of the PSA, Thompson had not yet received written authorization for the sale from MarcellX. It also is undisputed that Prime was not Shiner's client and that neither Shiner nor any Tucker employee or attorney engaged in direct communication with Prime. On December 18, 2015, the Prushnoks and Thompson executed a Resolution authorizing Thompson, as a "member" of MarcellX, to execute all documents and agreements necessary to complete the sale.[5] ECF No. 217-5.

David Prushnok testified that prior to executing the Resolution, he reviewed the PSA and knew that Prime was the buyer. ECF No. 217-6 at 8. David Prushnok also testified that it was an error to state that Thompson was a member of MarcellX, but he did not dispute that the intent of the document was to authorize Thompson to finalize the sale. Id.

The PSA provides that for $3,000,000 to be paid at the closing, Prime would purchase the Swamp Angel Lease; 100% of MarcellX's interest in 169 wells; all personal property and

---

[5] In its responses to Defendants' Concise Statement of the Facts related to the PSA and the MarcellX Resolution, Prime does not dispute the terms or language contained in the referenced documents – only their legal effect. See, e.g., ECF No. 255 ¶¶ 12-22. Because both documents are included in the record of this matter, the Court incorporates the language used and agreed to by the parties.

equipment located on or used in connection with the wells; all surface property rights; and all books and records pertaining to the lease and wells. ECF No. 255 ¶¶ 15, 16. The PSA also includes a provision addressing certain pre-closing duties and obligations of the parties regarding "capital expenditures" to be funded by Prime as "Buyer":

> It is Acknowledged and Agreed to, the amount of $165,000 (non-refundable) has been deposited into the "Seller's" attorney's account as an initial deposit toward capital expenditures. It is also acknowledged that within 5 business days of the signature of this Purchase and Sales Agreement an additional $435,000 will be deposited by electronic wire into the "Seller's" attorney's account totaling $600,000. "Seller" will produce at closing, an expense list of capital and legal expenditures that have already been paid out to begin the operations such as surveying, laying out well sites, clearing roads, installing platforms etc. up to $600,000 designated as the first draw down to be paid by wire on or before closing on December 22, 2015. In addition another $500,000 will be paid at closing on December 22, 2015 by wire for the second draw down payment to keep the operation moving forward as soon as possible, conditionally only if all requested documents, such as: current lease title search, all books, files, maps, records and reports (including, electronic data files that would not violate any license or law) pertaining primarily to the Leases and Wells, including, but not limited to, inspection reports, payment records, production reports, logs, and/or reports and filings to any state or federal agency (collectively, the "Records") after signing of this agreement and before closing on or about December 22, 2015.

ECF No. 217-7 at 2-3 (bold type omitted). Thus, Defendants assert, "[t]he parties expressly contemplated that Prime was contracting the Seller to perform the duties of operator for the 'continued operation of the [existing] Wells', Seller expected to receive '15% of the gross sales price paid for each barrel of oil produced', and the Seller would be entitled to participate in future 'oil and gas drilling on the Lease' for new wells."[6] ECF No. 255 ¶ 21.

---

[6] Prime seeks to strike this assertion on materiality or relevance grounds "as a complete diversion from the fraud claims in this case." ECF No. 255 ¶ 21. Prime does not dispute the language of the PSA or the duties set forth and does not meaningfully support or explain its contention that Defendants' factual assertions are immaterial or irrelevant. Therefore, in accordance with Federal Rule of Civil Procedure 56(e), the assertions of fact set forth at paragraph 21 of Defendants' Concise Statement of the Facts are considered undisputed for purposes of the pending motion.

The PSA further provides that MarcellX and Mid-East would "deliver… releases of all liens and encumbrances on the Wells, if any."[7] Id. ¶ 19. As relevant to the parties' dispute, the PSA included the representation that the Seller "has not heretofore" encumbered any of the Lease, and that "[o]ther than as disclosed on Schedule __, the Lease and Wells: (a) are not subject to any outstanding injunction, judgment, order, decree, ruling, or charge; and (b) are not the subject of any pending or threatened claim, demand, filing, cause of action, administrative proceeding, governmental action or other litigation." Id. ¶ 23. The Schedule was blank, and Shiner and Tucker did not cite the CNB Bank mortgages or add a list of pending litigation. Thus the PSA did not disclose two pending investment fraud actions against Thompson, his related companies, and the Prushnoks. In addition, the PSA omitted references to violations issued by the Pennsylvania Department of Environmental Resources regarding past oil and gas operations on the property.

Related to Thompson's ability to act on behalf of MarcellX, the PSA states that the "Seller has the requested power and authority to enter into this Agreement, to carry out the transactions contemplated hereby, to transfer the Lease, Wells and Records in the manner contemplated by this Agreement, and to undertake all of the obligations of Seller set forth in this Agreement." Id. Pursuant to the Resolution between the Prushnoks and Thompson, Thompson's authority to act on behalf of MarcellX to carry out the sale was in place three days later.

It also is undisputed that the PSA requires deposit money to be paid into the "'Seller's' attorney's account." Contrary to the language of the agreement, the deposits were forwarded to an account owned by Thompson and Mid-East Oil.

---

[7] Prime concedes that the quoted language appears in the contract, but contests any inference that Thompson and Mid-East are the "Seller" and any inference that the property later was delivered free of liens and encumbrances. Id.

Prime's representations under the PSA include standard clauses regarding the integration of any prior understandings or representations, and an acknowledgment that Prime did not rely on any comments or statements by the Seller's representatives. Id. ¶¶ 13, 14. The agreement also granted Prime the right to inspect the Lease, Wells, and Records before the Closing Date. Id. ¶ 23.

### E. Failure to Close Agreement

As of December 15, 2015, CNB Bank's loan remained in default with outstanding cure amounts due. Shiner continued to negotiate with CNB Bank and forwarded a copy of the executed PSA to CNB Bank's counsel with a request not to disclose Prime's identity to the Prushnoks. ECF No. 253 ¶ 65.

The closing scheduled for December 22, 2015 did not occur and Prime's final deposit payment of $435,000 was not remitted. The failure to close as scheduled is not explained by the parties but the record reflects that on December 29, 2015, Parker, Thompson, Belton, and Acunto met in Jupiter, Florida to discuss the final deposit and moving forward. ECF No. 253 ¶ 69; ECF No. 220-3 at 2. Parker emailed Thompson after the meeting regarding the remaining initial payment of $435,000 and his expectation that it would be wired and received "at your counsel" on December 30 or 31. Id. In an email dated December 30, Thompson told Russell that the funds had not been received and that "[i]t has to happen tomorrow. Or we pay [] major penalties. Or deal is off the table." ECF No. 220-6 at 4. There is no context provided related to whom the penalties would be paid, but the email was forwarded to CNB Bank by Shiner on December 31, adding that "[t]he client is all set up to wire to CNB as soon as the funds [h]it its account." Id. at 3.

The wire transfer by Lucas Corporation on Prime's behalf was made out to Shiner as the beneficiary, though Shiner was aware the transfer was going to "the client's" account. ECF No. 253 ¶ 71; ECF No. 220-4. By the close of business December 31, CNB Bank acknowledged receipt

of a cashier's check, ECF No. 220-5, and Shiner forwarded the email to the Prushnoks' attorney informing them that the cure amounts had been paid. ECF No. 220-6.

Thompson emailed Shiner on January 4, 2016, to advise him that he was sending Tucker $50,000, and that remitting the bank payment of $78,000 "tightened us again until we close." ECF No. 253 ¶ 77.

January 4, 2016 was also the day that Prime executed an Amendment to the PSA acknowledging that the closing did not occur as scheduled on December 22, 2015, because of Prime's breach of the agreement. ECF No. 255 ¶ 26. The amendment specified that the closing would occur between January 16, 2016, and January 31, 2016. Id.

### F. Evidence related to Prime's knowledge of missing escrow funds, mortgage default, and Prushnok ownership.

On January 18, 2016, Thompson emailed Belton, Acunto, and Parker photos of work allegedly being performed on the Swamp Angel Lease, along with an "Operational Report." ECF No. 255 ¶ 90; ECF No. 220-16. That same day, Belton emailed Acunto a list of expenses Thompson represented were incurred to "continue to brush, service rig, logging, repair." ECF No. 220-17. Belton told Acunto that **"[t]he $13,004.87 the last number at the bottom of the page is what's left in the escrow account today that has not been spent**." ECF No. 255 ¶ 91; ECF No. 220-17 (emphasis added). The listed expenses did not include the January 4, 2016, payment made to Tucker by Thompson. ECF No. 253 ¶ 87.

Upon hearing that only $13,000 was left out of the $600,000 paid, Acunto "questioned all of it on here and it was only a couple weeks after we got the $435,000 in place and all of the sudden we got this stuff. Hey, and they didn't discuss it with us until they sent us a list of this stuff." ECF No. 255 ¶ 93. Parker was apprised of the expenditures and was "furious when I saw this. … I said to John how the hell did this happen. That money was supposed to be residing in the escrow

account and we were supposed to get authorized expenses and a budget and we never received any of that." Id. ¶ 94. Parker testified that he believed the money "had been spent by Mark Thompson through the escrow account where the money should have been residing Tucker Arensberg." Id. In his deposition, Parker stated that on January 18, 2016, he believed Shiner was perpetrating a fraud on him.[8] Id.

Two days later, Belton sent an email directed to Thompson, with Shiner and Acunto as identified recipients, and requested a ground inventory and a narrative for the expenses paid out of the $600,000. ECF No. 217-28 at 9-11; ECF No. 250 ¶ 98; ECF No. 255 at 41.[9] Belton stated, "[w]e are not as concerned about the expenses being in order as we are just trying to get your deposit money paid back for the $600 you spent on the operation of opening the wells up and putting them on line. If you choose not to submit the narrative for the expenses prior to the closing you will just receive $2,400,000 at closing. Then you just won't get reimbursed for that amount that is not backed up with narrative and receipts, work orders, etc. until a later date after closing." ECF No. 217-28 at 9.

The newly scheduled closing for January 31, 2016, did not occur because Thompson did not provide the requested documentation. Id. at 1. A few weeks later, Thompson emailed the Prushnoks and Shiner to advise them that "the buyers are moving as quickly as they can to close this deal. They are wiring funds to make bank payments and we're just waiting on time … Mike

---

[8] In opposition to the pending Motion for Summary Judgment, Prime presents three affidavits to qualify and explain portions of Acunto and Parker's deposition testimony on the timing of notice that the deposit money was not retained in a Tucker escrow account and their belief that Shiner had committed a fraud. ECF Nos. 223, 224, and 225. The effect of the affidavits on Prime's burden of proof relating to the statute of limitations is addressed in the discussion section of this Opinion. As relevant here, the affidavits do not contradict Prime's receipt of the relevant emails or the contents of each email.

[9] Prime's Response to Defendants' Concise Statement of Material Facts at ECF No. 255 omits record citations (including those provided by Defendants) and does not retain the Defendants' paragraph numbers. The Court refers to Defendants' paragraph numbers for clarity.

has informed the bank of what is transpiring." ECF No. 253 ¶ 108; ECF No. 220-28 at 3. Thompson also issued a threat to the Prushnoks that he would "take action" against anyone who "calls MY BUYERS or Even sends a letter saying what they can do to expedite this sale. . . . Mr. Acunto and his group have no desire to talk to anyone by Myself and MY attorney." Id.

In response, the Prushnoks' attorney contacted Shiner and stated that a call was needed to discuss "roles going forward with respect to this transaction…. I anticipate the formal revocation of Mark [Thompson]'s authorization is immediately forthcoming." ECF No. 220-28 at 2-3. Shiner asked for patience to permit the anticipated closing to go forward and for the bank loan to be repaid. Id. On February 23, 2015, the Prushnoks' attorney wrote to Shiner to remind Thompson of his "fiduciary duties" to MarcellX and his obligation to be forthcoming "in all respects." ECF No. 220-28. Shiner forwarded the email to Thompson, and Thompson replied that "[w]e're doing the best we can" and that he was "working on getting rid of the lawsuits from the Sbarra group they created." ECF No. 220-31.

With the closing delayed, Thompson approached Prime for an additional $120,000 and disclosed that he would be remitting $78,000 to make a payment on the CNB Bank mortgage, and $40,000 for "Cap/Ex drilling and labor costs." ECF No. 250 ¶ 102; ECF No. 255 ¶ 98; ECF No. 217-29. On February 19, 2016, Belton emailed Thompson, Shiner, and Acunto, stating in part:

> Acknowledging the closing date has been moved from 11/21/15 and still has not closed as of today, due to historical dollar decreases in oil pricing, market vulnerability, a moratorium set on all new deals with the multi-billion oil/energy company we are working with. Prime Energy has done an excellent job keeping the transaction alive.
>
> John Acunto has put up his oil field in West Virginia as collateral of $2M. **Russell Parker and John Acunto are responsible to repay the $600,000 non-refundable deposit, they made in good faith, and now have committed to use their own money to advance another $120,000 to Mid-East. It is understood that the $120,000 will be used to pay Cap/Ex drilling and labor costs ($40,000) as well as the note to the bank ($78,000).**

> **The irony in all this why hasn't the bank note and the Cap/Ex been paid out of the $600K that has already been given as a non-refundable deposit.**
>
> That being said, Russell, John and I have agreed to fund another $120,000 as requested.
>
> \* \* \*

ECF No. 217-29. The email was signed by Belton in his capacity as "Vice President, Oil Field Operations, Prime Energy and Chemical, LLC." Id. Setting aside the parties' dispute related to Belton's capacity as a Prime employee or representative, the email was sent to Acunto and thus Prime again had notice that (1) ongoing expenses for well operations were payable from the funds previously provided, (2) the $600,000 had been spent and needed to be repaid to fund the $3 million sale price, (3) the sale price for the lease was exclusive of the "deposit" for ongoing operational expenses, and (4) a mortgage encumbering the property had not been paid. As related to the mortgage, Acunto states, "Prime Energy was told, on or about February 20, 2016, four months into the transaction, that there was a mortgage on the property. Prime Energy did not know the balance of the mortgage, but we immediately requested a bank estoppel letter. Neither Thompson, Shriner or TA ever supplied this estoppel information." ECF No. 223 at 6.

On February 24, 2016, Thompson's Mid-East Oil colleague emailed Parker with instructions to wire the extra funds to a Mid-East Oil account. ECF No. 250 ¶ 105. The account was the same account used by Prime for its initial $600,000 payments. ECF No. 250 ¶ 106; ECF No. 255 ¶ 102. Parker advised Acunto's sister to send the wire to "Shiner's account," based on his impression that the account was a Tucker escrow account. ECF No. 255 ¶ 101. Of the requested $120,000, Prime remitted only $78,000. ECF No. 250 ¶ 108; ECF No. 255 ¶ 104. From that amount, Thompson paid $39,000 to CNB Bank. Id.

Counsel for CNB Bank contacted Shiner and the Prushnoks' attorney regarding the bank's ongoing concern with default, and the insufficiency of the $39,000 payment to cure the existing default. ECF No. 253 ¶ 99; ECF No. 220-25; ECF No. 220-32. Prime alleges it was unaware of the default but on March 2, 2016, Belton emailed Thompson and demanded proof in the form of a copy of a certified check that the $78,000 it remitted was actually paid to CNB Bank. ECF No. 253 ¶ 116; ECF No. 220-33. Thompson responded to Belton, Acunto, Parker, and Shiner that he had not yet received the full $120,000 promised by Prime despite representations from Prime and Russell that the payment would be made. Id. This prompted an angry response from Acunto, also on March 2, 2016:

> Mark I agreed to send the $78798.97.
> Before you informed you needed 120000. This payment is your obligation not mine and as such I am demanding a copy of the certified check from Mark Shiner's trust account. Now.
> Don't play games with me.  You have been on the receiving end of $678,000 and you have the unmitigated gall to ask for payment for your contractor. I expect a copy of the check in return email.

Id. Shiner suggested that Thompson respond to this email by explaining first, that the wire was sent to Mid-East Oil and not to a Tucker escrow account and, second, that $39,000 was sent to CNB Bank, and the remainder "was spent as follows _____." ECF No. 220-34. Shiner also recommended that Thompson state that a Mid-East Oil representative would follow up the next day with more detail. Id.

That same day, Belton emailed Thompson and stated:

> John [Acunto] just got a call from Russell [Parker] saying he's confused about taking out your partners (Prushnoks) for $1.5. We are under the impression that you are to receive $1.5 and Prushnoks are to receive $1.5 as you have indicated on many conversations in the past. Please clarify…
>
> We're also working on getting the formal settlement statement with accompanying documents with our attorney, and will get them to you and Mike Shiner as soon as they are complete.

ECF No. 220-36 at 3. This email was sent the same day Thompson and Parker exchanged emails explaining the Prushnoks' share of the bank loan and ownership interest in the property. ECF No. 217-17. After Belton expressed confusion, Shiner recommended that Thompson email both Belton and Parker to explain that at closing, the CNB Bank loans guaranteed equally by the Prushnoks and Thompson would be repaid so that clear title would be assigned to Prime. The Prushnoks also would transfer their ownership interests in MarcellX to Thompson. ECF No. 220-36. In response to Thompson's emails, Parker replied, "Thank you for that clarification. I understand perfectly." ECF No. 217-17 at 4.

In sum and as reflected in the record and not reasonably disputed by Prime, as of March 2, 2016, Prime knew or should have known: (1) the Swamp Angel Lease was owned by MarcellX, (2) the Prushnoks were at least fifty-percent owners of MarcellX, (3) the property was encumbered by outstanding and defaulted mortgage obligations with CNB Bank, and (4) money forwarded by Prime intended for an attorney escrow account had been spent and was not satisfactorily accounted for, such that Prime demanded proof of each expenditure.

### G. Prushnoks Move Forward Without Thompson

On March 9, 2016, Shiner sent Prime a letter advising that Prime's failure to consummate the closing on March 14, 2016 would breach the PSA, permitting the sellers to exercise their legal rights and remedies under the agreement. ECF No. 221-3. Acunto responded on March 11, 2016, with a letter to Thompson and Shiner listing "issues" discovered during the "examination processes" engaged in by Prime to further the purchase. ECF No. 221-4. Included on the list were inconsistencies in the future allocation of oil and gas proceeds, the lack of details as to the authorization and review of expenses, well production data, and the failure to provide documentation related to expenses paid with Prime's previous payments. Id. Prime also stated it

would not close the transaction as scheduled, and that it too reserved its legal rights given the "great expense" it had incurred.

Shiner responded to Prime on March 14, 2016, with a list of correspondence documenting Prime's ongoing intention to close the sale and their stated satisfaction with documentation received. ECF No. 221-5. Shiner advised that given Prime's breach, the Sellers would "commence litigation if Prime [did] not close by 5PM Eastern time today." Id. Thompson advised the Prushnoks, Prime, and Belton of his instruction to Shiner to sue Prime, and his instruction that all well operations on Swamp Angel be stopped until a solution is reached. ECF No. 221-7. Shiner separately emailed Thompson with a request that such emails be sent to him first to be "tweaked." ECF No. 221-8. He also told Thompson that he spoke with the Prushnoks' attorney and requested a meeting so that litigation could be avoided. Id.

On March 17, 2016, counsel for the Prushnoks forwarded an "Extension Agreement" to Prime's counsel. ECF No. 221-9. Shiner and Thompson were not included in this correspondence or the agreement. The agreement was executed by the Prushnoks on behalf of MarcellX for the sale of Swamp Angel Lease for $3,000,000, and required a $400,000 non-refundable payment to be remitted by Prime to MarcellX within three business days. The agreement also changed the closing date to July 15, 2016. Id. MarcellX, through the Prushnoks only, agreed to continue well operations at MarcellX's expense and to make regular payments to CNB Bank until closing. Prime forwarded the non-refundable payment to the Prushnoks, and the two sides of this transaction moved forward without Thompson or Shiner.

On March 22, 2016, after learning of the Prushnoks' deal, Thompson directed Shiner to notify the parties of his intention to file suit. ECF No. 221-11. Shiner reminded Thompson that suit could be filed only on behalf of Mid-East and another Thompson affiliated company, but not

MarcellX. ECF No. 221-12. Prime's newly retained attorney wrote to Shiner on May 17, 2016, and asked about the location of the $678,000 that was "wired to your escrow account in good faith as a required deposit for the $3,000,000 purchase price" and as "payment to CNB Bank."[10]  ECF No. 221-14. The letter also served as notice cancelling any agreement for future well operations with Thompson's related company and stated that Prime reserved its right to "seek any and all damages which will be the responsibility of Mr. Thompson." Id.

Shiner responded on June 10, 2016, and advised that none of the wires were sent to Tucker's escrow account, and that the money had been spent to pay for well operating expenses, "as requested by Prime." ECF No. 221-15. Prime's counsel replied to Shiner accusing Thompson of fraud related to instructions to wire funds that were used to enrich Thompson. He also shared Prime's newfound knowledge of undisclosed litigation affecting the assets, and again raised the lack of documentation regarding expenses that were paid from the proceeds of Prime's deposits. ECF No. 221-16.

Prime obtained a title report on July 1, 2016, from Hellwig Land Resources, a company operated by Prime's counsel. ECF No. 217-33; ECF No. 232-4; ECF No. 217-4 at 18. The report confirmed that (1) MarcellX owned the Swamp Angel Lease, (2) the property was encumbered by mortgages held by CNB Bank, (3) there were pending judgments and litigation alleging fraud against Thompson, the Prushnoks, and MarcellX in Kansas and Pennsylvania, and (4) environmental "issues" were being pursued by the Pennsylvania Department of Environmental

---

[10] Prime contacted Adam Hellwig in mid-March 2016 to discuss issues related to the purchase of the Swamp Angel property. ECF No. 224 ¶ 3.

Protection ("DEP") on the Angel Swamp Lease as identified on the DEP's public eFacts website.[11] Id. See also ECF No. 255 ¶ 107.

Before closing with the Prushnoks in July 2016, Prime received an indemnity agreement from MarcellX against any liability arising from the Pennsylvania federal court litigation. ECF No. 255 ¶ 108. The Kansas litigation previously settled with no adverse effects on the Swamp Angel Lease assets, and the Pennsylvania federal court litigation later resolved with a consent judgment against Thompson and a Thompson owned entity (Horizontal Exploration, LLC). ECF No. 255.

On July 21, 2016, Prime closed the Swamp Angel Purchase with MarcellX. ECF No. 253 ¶ 155. The next day, counsel for Prime wrote to Shiner to "reiterate that all agreements with Mid-East Oil and LRD Operating are cancelled." Id. ¶ 156.

### H.  Litigation Between the Various Parties

Shiner filed suit against Prime on behalf of Mid-East Oil and LRD in the Court of Common Pleas of Indiana County on September 20, 2016. ECF No. 253 ¶¶ 159 – 165. Upon learning of the litigation, Prime's litigation counsel demanded return of the $678,000 that "was required to be placed into [Defendants'] escrow account. Id. ¶ 166. Prime counterclaimed against Mid-East Oil, LRD, and Thompson for misrepresentation, fraud, conversion, and unjust enrichment. ECF No. 255 ¶ 33.

Prime followed with the initiation of this lawsuit on March 15, 2018. ECF No. 1. In the Second Amended Complaint, Prime alleges that Shiner and Tucker engaged in "fraudulent misrepresentations and concealment" concerning:

---

[11]  See   https://www.ahs.dep.pa.gov/eFACTSWeb/searchResults_singleSite.aspx?SiteID=768061   (identifying inspection results and violations through a search of inspections or sites by county, township, and site name).

(1) Mark Thompson's alleged ownership of the Property through MarcellX and MidEast Oil;

(2) Defendants' commitment to ensure the fulfillment of Prime Energy's purchase of the Property by its deposit of $600,000 (representing 20% of the $3 million total purchase price) into a designated attorney escrow account, when Defendants knew that the $600,000 in fact was not transferred to the attorney escrow account but instead was delivered to an account controlled wholly by Thompson and was never in fact applied as a deposit on the purchase of the Property; and

(3) the purported absence of litigation to which the Property was subject, when in fact, at the very time of the events recited herein, Thompson and a company controlled by him were Defendants in this Court, represented by Tucker Arensberg and Shiner in a multi-million-dollar fraud case involving the same Swamp Angel Property.

ECF No. 50 ¶ 18. Prime also alleges that Defendants failed to disclose the existence of the CNB mortgage and that Defendants prepared the PSA and misrepresented that Thompson, Mid-East Oil and MarcellX "owned the assets free and clear with no liens or encumbrances." Id. ¶ 22. In addition, the PSA falsely represented that there were no administrative proceedings related to the property despite pending state environmental violations.

On May 3, 2018, the parties to the Indiana County litigation entered into a Settlement Agreement and Release pursuant to which Prime settled, dismissed, and released its counterclaims against Thompson, Mid-East Oil, and LRD. ECF No. 255 ¶ 35; ECF No. 217-11 (Indiana County Litigation Release Agreement).

Defendants then filed a Motion to Dismiss this action based on the legal insufficiency of fraud claims asserted against counsel for an opposing party in a transaction. ECF No. 15. The Motion to Dismiss was denied because Prime's allegations related to Defendants' alleged misrepresentations were, on balance at the pleading stage of the litigation, sufficient to state a claim for relief. ECF No. 28. Prime filed an Amended Complaint, and Defendants filed an Answer. ECF Nos. 32, 33.

As part of a realignment of case assignments necessitated by a then-existing shortage of federal judges in this District, this action was assigned on October 23, 2018, to United States District Judge Yvette Kane, who was sitting by designation. Thereafter, Prime filed the operative Second Amended Complaint. ECF No. 50. Defendants filed a motion to dismiss that was denied on August 12, 2019. ECF No. 91.

Over the next three years, the parties engaged in extensive and contested discovery. On June 24, 2022, after the filling of judicial vacancies, this case returned to the undersigned. ECF No. 187.

This Court resolved pending discovery disputes and issued a scheduling order for the filing of Motions for Summary Judgment. ECF Nos. 194, 204. Defendants filed the pending Motion for Summary Judgment, Brief in Support of Motion for Summary Judgment, Concise Statement of Material Facts, and exhibits in support of the motion. ECF Nos. 212 – 218. Prime filed a Statement of Material Undisputed Facts and exhibits in opposition to the Motion for Summary Judgment, but its brief and response to Defendants' Concise Statement of Material Facts were not timely filed. ECF Nos. 219-225, 243. Prime requested and was granted leave to file these documents after the Court's deadline, and Prime filed its brief and response along with several additional exhibits. ECF Nos. 226, 231, 232, 233. Defendants responded to Prime's Statement of Undisputed Facts, and the parties filed Reply and Sur-Reply briefs and exhibits. ECF Nos. 236-240. Prime followed with a motion to refile its briefs to incorporate case citations, which this Court granted on December 12, 2022. ECF Nos. 241, 244. Prime's operative Brief in Opposition to the Motion for Summary Judgment and Sur-Reply were docketed a day later. ECF Nos. 245-246.

As previously noted in this Opinion, the Court directed Prime to refile its Statement of Material and Undisputed Facts, Response to Defendants' Concise Statement of Material Facts, and

briefs filed in opposition to the pending Motion for Summary Judgment to include ECF citations to the voluminous exhibits filed by the parties. ECF No. 249. Apart from materials filed by Prime that were stricken by the Court for noncompliance with the order, the operative briefs and statements of facts are at ECF Nos. 245, 246, 250-255.

Defendants' Motion for Summary Judgment is ripe for consideration.

## II.      JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) based on the diversity of citizenship between the opposing parties and because the amount in controversy exceeds $75,000. Acunto and Parker are Florida residents; Tucker Arensberg, P.C. is a professional corporation with its principal place of business in Pittsburgh, Pennsylvania; and Michael A. Shiner is a shareholder in Tucker's Pittsburgh, Pennsylvania office and is domiciled in Pennsylvania. ECF No. 50 ¶¶ 5-7; ECF No. 95 ¶¶ 5-7; ECF No. 217-2 at 3; ECF No. 217-4 at 3; ECF No. 225 at 6.

## III.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of proving to the Court that the evidence of records fails to support the non-moving party's case. Celotex, 477 U.S. at 322; Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Matreale v. New Jersey Dep't of Mil. & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

## IV.    DISCUSSION

Defendants seek summary judgment as to Prime's claims for fraud, reckless misrepresentation, negligent supervision, and respondeat superior because each claim is barred by Pennsylvania's statute of limitations. Upon review, the Court agrees that the claims are time-barred and therefore it does not need to consider Defendants' alternative bases for summary judgment.

A.       **Statute of Limitations – Applicable Law**

The parties do not dispute that Prime's claims arose in Pennsylvania and are governed by Pennsylvania's two-year statute of limitations for claims "founded on negligent, intentional, or otherwise tortious conduct … including deceit or fraud." 42 Pa. Cons. Stat. § 5524 (7). See also SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 218 (3d Cir. 2022) (under the relevant Pennsylvania statute of limitations, a party has two years to sue for fraud). Pennsylvania law provides that in computing the limitation period, the time to file begins "from the time the cause of action accrued[.]" 42 Pa. Const. Stat. § 5502(a).

"Normally, a cause of action accrues 'when an injury is inflicted.'" Rice v. Diocese of Altoona-Johnstown, 255 A.3d 237, 246 (Pa. 2021) (quoting Wilson v. El-Daief, 964 A.2d 354, 364 (Pa. 2009)). "Thus, the clock 'begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations.[.]'" Id. (quoting Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983)).

Once a claim has accrued, Pennsylvania law provides two avenues for relief from the operation of the statute of limitations: the "discovery rule" and the doctrine of fraudulent concealment. "[T]he discovery rule 'tolls the statute of limitations when an injury or its cause is not reasonably knowable.'" Rice, 255 A.3d at 247 (quoting In re Risperdal Litig., 223 A.3d 633, 640 (Pa. 2019)). "The purpose of this rule is clear: to 'ensure that persons who are reasonably unaware of an injury that is not immediately ascertainable have essentially the same rights as those who suffer an immediately ascertainable injury.'" Id. (quoting Nicolaou v. Martin, 195 A.3d 880, 892 n.13 (Pa. 2018)).

In Pennsylvania, the discovery rule is narrowly construed. "The plaintiff's inability to know of the injury must be 'despite the exercise of reasonable diligence[.]'" Id. (quoting Fine v. Checcio, 870 A.2d 850, 858 (Pa. 2005)). "Reasonable diligence means that a plaintiff has investigated his injury with sufficient 'attention, knowledge, intelligence and judgment which society expects of its members." Harry Miller Corp. v. Mancuso Chemicals Ltd., 469 F. Supp. 2d 303, 312 (E.D. Pa. 2007) (quoting Pocono Int'l, 468 A.2d at 471). "This 'is not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised.'" Rice, 255 A.3d at 247.

In this regard, Pennsylvania follows a "stricter and less plaintiff favorable 'inquiry notice' approach." Id. (quoting Wilson, 964 A.2d at 364). The inquiry notice approach "'t[ies] commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact or actual negligence, or precise cause.'" Id.

In cases of fraud, "a claimant need only be put on inquiry notice by 'storm warnings' of possible fraud." Beauty Time, Inc. v. VU Skin Sys., Inc., 118 F.3d 140, 148 (3d Cir. 1997). See also LabMD Inc. v. Boback, 47 F.4th 164, 182 (3d Cir. 2022) (under Pennsylvania law, for the two-year limitations period for fraud to begin running, "a claimant need only be put on inquiry notice by 'storm warnings' of possible fraud." Id. The statute of limitations for negligent misrepresentation is also two years. 42 Pa. Cons. Stat. § 5524(7)).

In SodexoMAGIC, the United States Court of Appeals for the Third Circuit held that once a cross-claimant had constructive knowledge of a potential material misrepresentation in an agreement reached by the parties, the discovery rule no longer tolled the statute of limitations, and

the claimant had two years to investigate and sue. The failure to do so within that period barred a fraud claim. 24 F.4th at 218-19 (citing Gleason v. Borough of Moosic, 15 A.3d 479, 484 (2011)).

The related fraudulent concealment doctrine provides the second avenue for relief and "is rooted in the recognition that fraud can prevent a plaintiff from even knowing that he or she has been defrauded. Effectively, the distinction is that where fraud has prevented the plaintiff from knowing of his or her cause of action, that cause of action simply does not even exist until the plaintiff becomes aware of, i.e., 'discovers,' the fraud." Rice, 255 A.3d at 248.

The principles governing application of the fraudulent concealment doctrine have been explained by the Pennsylvania Supreme Court as follows:

> Where, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry," the defendant is estopped from invoking the bar of the statute of limitations. Schaffer v. Larzelere, 410 Pa. 402, 405, 189 A.2d 267, 269 (1963). Moreover, defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient. Walters v. Ditzler, 424 Pa. 445, 227 A.2d 833 (1967); Nesbitt v. Erie Coach Company, 416 Pa. 89, 204 A.2d 473 (1964). Mere mistake, misunderstanding or lack of knowledge is insufficient however, Schaffer v. Larzelere, supra; and the burden of proving such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party. Nesbitt v. Erie Coach Company, supra.

Rice, 255 A.3d at 248 (quoting Molineaux v. Reed, 532 A.2d 792, 794 (Pa. 1987)). "As indicated, fraud or concealment incorporates a causal element by asking whether the fraud or concealment 'cause[d] the plaintiff to relax his vigilance or deviate from his right of inquiry[.]'" Id. The doctrine does not require that a plaintiff have actual knowledge of his injury or cause, or of the facts constituting the fraud or mistake. Id. at 249. Rather, like the discovery rule, the plaintiff must have acted with reasonable diligence. Id.

"Once the statute of limitations expires, the plaintiff bears the burden of showing that the claims were timely filed because of an applicable tolling doctrine." Harry Miller, 469 F. Supp. 2d at 313. This would require a plaintiff to show that it exercised reasonable due diligence but was

nevertheless unable to discover its injuries. "The question of whether a plaintiff has exercised reasonable diligence is generally a question for the jury, but the Court may decide that the discovery rule does not apply as a matter of law where reasonable minds would not differ about whether the plaintiff knew or should have known through the exercise of reasonable diligence of his injury and the cause of his injury." Id.

**B.    Defendants' Arguments in Support of Motion**

Defendants argue that Prime's claims accrued before March 15, 2016, and are not subject to tolling or otherwise within an exception to the statute of limitations. Therefore, since this federal lawsuit was not filed until March 15, 2018, Prime's claims are barred and summary judgment is properly entered.

First, Defendants contend that Belton was acting as Prime's agent and as such, his knowledge is imputed to Prime. Second, the undisputed record establishes that as to each alleged misrepresentation, Prime knew or should have known "at numerous times in advance of March 15, 2016, the facts pertaining to each of the alleged 'misrepresentations.'" ECF No. 251 at 28. In this regard, Defendants point to the undisputed evidence of record including, among other things:

(i)     The PSA was executed on December 15, 2015, and identified MarcellX as the owner of the Swamp Angel Lease. Thus, any inference that Mid-East Oil was the owner was no longer reasonable.

(ii)    Acunto's bank statements in the fall of 2015 would have established that the deposit money was not wired to a Tucker account, but to the same Mid-East Oil account from which Belton's commissions were remitted.

(iii)   Emails dated January 4, 2016 and January 18, 2016 between Belton, Prime, and Thompson reflect that Prime requested information related to expenses

paid out of the $600,000 initial deposit for "CapEx" and further disclosed that except for $13,000, all deposit money had been spent and was not in an escrow account. ECF No. 251 at 29 (citing ECF No. 217-22; ECF No. 217-26; ECF No. 217-27).

(iv)    In a follow-up email dated January 20, 2016, Prime demanded a "narrative and receipts to justify the spend down of the $600,000 in deposit monies." Id. (internal quotation marks omitted) (citing ECF No. 217-28 at 9-10).

(v)     Emails dated February 2016 reveal that Acunto and Parker were aware of the CNB Bank mortgage and the need to remit funds to keep it current. Id. (citing ECF No. 217-30; ECF No. 217-31).

(vi)    Acunto explained that the February 2016 wire for CNB Bank sent to a Mid-East Oil account "should have caused Parker to have screamed fraud." Id. (quoting ECF No. 217-4 at 17 (internal quotation marks omitted)).

(vii)   Emails dated March 2, 2016, between Parker, Acunto, and Thompson, with one drafted by Shiner and forwarded by Thompson to Parker, explained how the Prushnoks' share of the MarcellX mortgage from CNB Bank would be paid at closing, the details of the MarcellX Resolution authorizing the PSA with Prime, the anticipated transfer of clear title to the Swamp Angel Lease to Prime, and the Prushnoks' transfer of their interests in MarcellX to Thompson. In response, Parker emailed Thompson, "Thank you for that clarification. I understand perfectly." Id. (quoting ECF No. 217-17).

Defendants also cite Pennsylvania's requirement that a purchaser of real estate "investigate the title of his vendor." ECF No. 251 at 32 (quoting Ohio River Junction R. Co. v. Pennsylvania

Co., 72 A.271, 273 (Pa. 1909), and citing Lund v. Heinrich, 189 A.2d 581, 585 (Pa. 1963), Nolt v. TS Calkins & Assocs., LP, 96 A.3d 1042, 1048 (Pa. Super. 2014), and 21 Pa. Stat. and Cons. Stat. §§ 356-5)). Defendants contend that had Prime conducted the due diligence required by Pennsylvania law before the originally scheduled closing,  Prime would have identified (1) the owner of the Swamp Angel Lease (MarcellX); the CNB Bank mortgage; (3) the litigation related to the property involving the Prushnoks and Thompson; and (4) the DEP environmental issues. As proof of what was publicly available, Defendants cite the Title Opinion prepared by Prime's attorney in July 2016 that listed available public records revealing each of these potential encumbrances on the land. ECF No. 251 at 33.

Defendants argue that based on this evidence, Prime knew, or with the exercise of due diligence, should have known before March 15, 2016 of the alleged misrepresentations that support its claims. Therefore, the discovery rule and fraudulent concealment exceptions to the statute of limitations do not preclude application of the statute of limitations, and Prime's failure to file suit before March 15, 2018 bars its claims.

### C.  Prime's Arguments in Opposition to Motion

Prime does not address whether it could have discovered Defendants' alleged misrepresentations and alleged fraud once it was aware of or suspected Thompson's potential fraud in January 2016. Instead, Prime first argues that Acunto had no duty to review his bank statements, even if review would have revealed that the accounts to which deposits were wired were not Tucker accounts. ECF No. 245 at 6.

Second, Prime presents affidavits by Parker, Acunto, and Prime's attorney in opposition to the instant Motion for Summary Judgment that "make clear that [Parker and Acunto] did not realize that Thompson/Mid-East had actually committed fraud to steal the $600,000 as of January

18, 2016; rather, they were outraged to see that the supposed expenses could not have been paid out of the escrow." Id. Prime contends that Defendants' citation to a portion of Parker's deposition to establish the timing of his awareness of allegedly fraudulent misrepresentations is misleading given "two other passages from the same few pages of his deposition which clearly rebut Defendants' interpretation." ECF No. 239 at 5.  Thus, there "is no issue to discuss regarding the statute of limitations." Id.

Third, application of the discovery rule and the fraudulent concealment doctrine requires factual determinations that are to be left to a jury. Prime contends that the timing of Prime's knowledge of Shiner/TA's fraud "may have differed from its knowledge" of Thompson and Mid-East's fraud such that a jury should determine what constitutes a reasonable time for Prime to have discovered its injury and its cause. ECF No. 245 at 8.

Fourth, Prime argues that Belton's knowledge cannot be imputed to Prime because he was not a Prime agent. Instead, Prime asserts that under the 2015 Fee Agreement, Belton was an agent acting on behalf of Mid-East Oil and Thompson. Thus, Belton's references to an escrow account are binding on Tucker and Shiner "who were responsible for that account" and thus also responsible for Belton's representations made to "steal Prime Energy's deposit money." Id. at 11.

### D.    Sham Affidavit Rule

Prime broadly contends the "affidavits from Adam Hellwig and John Acunto in opposition to Defendants' motion for summary judgment demonstrate that there was no knowledge by Prime Energy of a claim of fraud against *Shiner and Tucker Arensberg* until October 2016." Id. (emphasis in original). Along with the affidavit submitted by Parker, Prime asserts these exhibits raise issues of fact related to the timing of Prime's notice of fraud such that Defendants are not entitled to summary judgment based on the statute of limitations. Prime anticipated Defendants'

position that the affidavits are subject to the "sham affidavit" rule and declares "[t]hey are not."

Id.

The United States Court of Appeals for the Third Circuit had explained that under the sham affidavit doctrine, "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Jimenez v. All Am. Rathskeller, Inc., 503 F.3d 247, 251-53 (3d Cir. 2007) (quoting Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)).

> When a nonmovant's affidavit contradicts earlier deposition testimony without a satisfactory or plausible explanation, a district court may disregard it at summary judgment in deciding if a genuine, material factual dispute exists. See Hackman, 932 F.2d at 241; Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). This is the sham-affidavit doctrine. In applying it we adhere to a "flexible approach," Jiminez, 503 F.3d at 254, giving due regard to the "surrounding circumstances," Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004).

> If, for example, the witness shows she was "confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact." Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 705 (3d Cir. 1988); see Jiminez, 503 F.3d at 254. Same result if there's "independent evidence in the record to bolster an otherwise questionable affidavit." Baer, 392 F.3d at 625.

> The court may, on the other hand, disregard an affidavit when the "affiant was carefully questioned on the issue, had access to the relevant information at that time, and provided no satisfactory explanation for the later contradiction." Martin, 851 F.2d at 706; see Jiminez, 503 F.3d at 254. It may similarly disregard an affidavit "entirely unsupported by the record and directly contrary to [other relevant] testimony," Jiminez, 503 F.3d at 254, or if it's "clear" the affidavit was offered "solely" to defeat summary judgment, id. at 253; see In re CitX Corp., Inc., 448 F.3d 672, 679 (3d Cir. 2006); Martin, 851 F.2d at 705.

Daubert v. NRA Grp., LLC, 861 F.3d 382, 391–92 (3d Cir. 2017).

In Daubert, the Third Circuit held that the District Court "acted well within its discretion" to disregard an affidavit from a deponent's co-worker that "flatly contradicted" earlier deposition testimony because the defendant did not give the court a satisfactory explanation for the

discrepancy. Id. The defendant did not point to any independent evidence in the record corroborating the affidavit, or explain how or why the witness was mistaken or confused at the time of her deposition regarding the subject matter of the later-filed affidavit. Without a satisfactory explanation, the Third Circuit concluded that the district court did not abuse its discretion "in declining to indulge [the defendant's] attempt to paper over [the deponent's] damning 30(b)(6) testimony with [a co-worker's] affidavit." Id. at 393.

In Thomas v. Bronco Oilfield Services, 503 F. Supp. 3d 276 (W.D. Pa. 2020), the district court explained that "when deposition testimony is ambiguous or incomplete, subsequent affidavits may help to clarify the testimony without being disregarded as sham documents." Thomas, 503 F. Supp. 3d at 288 n.7. For that reason, an affidavit need not be disregarded wholesale. Instead, the court "considers, for each occasion that it is cited but Defendant contests the citation, whether there is a plausible explanation for any contradictory statements in question and whether independent record evidence supports the affidavit's statements." Id. The district court therefore rejected only those portions of the plaintiff's affidavit that contradicted unequivocal statements made during his deposition, given that he was deposed at length under oath and the statements at issue were not ambiguous or incomplete.

Here, the parties point to portions of the following deposition testimony by Parker, taken under oath while represented by counsel, as critical to the Court's consideration of the pending motion:

9       Q.    This e-mail says -- it's January 18,
10 2016 from Tom Belton to prime920 which is
11 identified 920@aol.com which is identified as
12 John Acunto's e-mail address. It says, John,
13 here is a list of expenses to date of the draw
14 against the 600K. Mark has the backup receipts
15 for all expenses if you need them or want them
16 included in the report. We can review them whe
17 you go to PA or I can get them before the trip
18 if you want. The $13,000 -- the last number at
19 the bottom of the page is what's left in the
20 escrow account today, that has not been spent.
21            So on January 18, 2016 Prime Energy
22 is aware that Mr. Thompson has spent all, but
23 $13,000 that was placed -- that was -- that you
24 believed was placed in escrow account; isn't
25 that right?

1      A.    It says escrow account; does it not?
2      Q.    Right.
3      A.    So let's take a look at this.
4      Q.    My question is this, as of the date,
5 January 18, you were -- Prime Energy and
6 Chemical, LLC was aware that all, but $13,000 of
7 the $600,000 that Prime Energy believed was in
8 the escrow account was spent?
9      A.    I was furious when I saw this.
10     Q.    Right, because you were aware that
11 all but, $13,000 of the $600,000 was spent on
12 January 18, 2016?
13           MR. MANUEL: Tell him why you
14 were furious.
15     A.    I said to John how the hell did this
16 happen. That money was supposed to be residing
17 in the escrow account and we were supposed to
18 get authorized expenses and a budget and we
19 never received any of that.
20           Now I can tell you, counselor, you
21 want to see fraud, see the third up 24,000 feet
22 of four inch plastic pipe, $60,000, Mark
23 Thompson never owned that. That went with the
24 property. So he's talking about, oh, we spent
25 $60,000 on pipe. He did not.

1            Let's go to the very top. Kitlinger
2 locations, done for Horizontal, not for Prime's
3 benefit, $145,000. Let's talk about these
4 surveys. Nothing to do with our property.
5      Q.    Sir, I know the allegations, but
6 you're not answering my question.
7      A.    I am answering your question.
8      Q.    Are you aware -- you were aware on
9 January -- I just want an answer to this
10 question and you can go on a long list of things
11 you want to say.
12     A.    Okay.
13     Q.    Prime Energy and Chemical on January
14 18, 2016 was aware that all but, $13,000 of the
15 $600,000 that Prime Energy believed was in an
16 escrow account had been spent by Mark Thompson?
17     A.    Had been spent by Mark Thompson
18 through the escrow account where the money
19 should have been residing Tucker Arensberg.
20     Q.    Is that a yes?
21     A.    Yes.
22     Q.    So on January 18 --
23           MR. MANUEL: No. Wait. Now
24 continue your answer that he interrupted a
25 moment ago. You had spoken about the surveys.

       Did you complete what you were saying about the
  surveys?
     A.    No, I did not.
           MR. MANUEL: Continue with
  whatever you want to say about this list.
     A.    I will just sum it up --
           MR. MANUEL: No need to sum it.
  Just lay it out.
     A.    This did not benefit Prime. None of
  this benefited Prime. Okay. What really hurt
  us is that how this money got into his hands to
  so-called spend this to begin with. Because
  when you look at the second line of expenses it
  shows we owe $143,000 -- I believe there was
  another exhibit you showed yesterday to Mr.
  Acunto. All of the sudden Thompson is claiming
  he spent $750,000 and then he sends fictitious
  things, we worked on 27 wells and we are
  repairing two of them a day. You can't repair
  two wells in a day. I have been out on the
  field. I see what they have to do, pulling the
  pipes out, pulling the rods out and it's
  laborious. It just doesn't happen.
           This whole thing -- these are great
  you're bringing these up, but it does not

Page 100

1 absolutely go to the fact that we entrusted our
2 money to the client you're representing. Okay.
3 And that money was mishandled and it damaged us.
4 I'm out $600 -- so when you see this -- do you
5 know when I saw the real bills? Mr. Shiner held
6 them until October, after he filed the lawsuit
7 against us. And he testified that he didn't
8 know about those expenses until October.
9        Well, it's a fact that he showed them
10 to Matt Logue in March and then he sent them
11 again just before we closed in July. All of
12 this time my attorney, Adam Hellwig is asking
13 specifically where are the expenses, Mr. Shiner.
14 Oh, he testified, gee, they didn't send them to
15 me, I sent them as soon as I got them --
16 October -- and he filed a malicious lawsuit
17 against us in January after he sent the stuff.
18 So this whole thing -- this house of cards is
19 falling down.
20        And I'm here to tell you we have been
21 damaged and it states in the PSA -- it's here
22 again. Here's the word escrow. It's everywhere
23 in all of the documents. We haven't even gotten
24 into all of the concealment which I'm sure
25 you're show me documents and I'll let you know

Page 101

1 what was concealed.
2      Q.   On January 18, 2016 Prime Energy and
3 Chemical, LLC was aware that the $600,000 that
4 they believed was residing in an escrow account
5 was not in fact residing in an escrow account;
6 isn't that true?
7      A.   That is true, with no proof of
8 anything. I just have a list here of supposed
9 expenses which were not authorized.
10     Q.   If we go -- how about this, so you
11 were aware of that. Did you -- did you state --
12 did you tell Mr. Thompson, hey, wait a minute,
13 that wasn't our agreement, why are you spending
14 this money?
15     A.   We had that discussion on a
16 conference call because in February we had a
17 conference call where he was demanding even more
18 money. I say why are you asking for more
19 money. You told us that this was your money you
20 were spending. You told us this was your money
21 you were spending, what is going on here. I'm
22 not sending you $120,000 and then, well, if you
23 don't send me the money, the deal is off. We're
24 going to have a bunch of problems with the bank.
25 What bank? Now you want me to send money to a

Page 102

1 bank.
2      Q.   You didn't contact Mr. Shiner either;
3 did you?
4      A.   We contacted Mark. I never contacted
5 Mr. Shiner because we still thought money was
6 residing in the account because he said that was
7 my money, you're going to reimburse me.
8      Q.   No, no, no.
9        You just said that you were aware
10 that there was -- on January 18 that the money
11 wasn't residing in Mr. Shiner's account. You
12 just said that.
13     A.   Yeah, correct.
14     Q.   So on January 18, 2016 you believed
15 that Mr. Shiner was perpetrating a fraud on you;
16 didn't you?
17     A.   He sure did.
18     Q.   And you didn't even call him?
19     A.   He's not our counsel. How am I going
20 call to an attorney --
21     Q.   You just said you believed he's
22 perpetrating a fraud on you. This is a pretty
23 serious matter; isn't it?
24     A.   This is after the fact, after we
25 learned everything.

Page 103

1      Q.   On January 18, 2016 you learned it?
2      A.   I learned about this part, but there
3 was no -- that's what I'm trying to tell you,
4 counselor. I know what I'm saying is that there
5 was no backup to this. I don't know where the
6 real money went to this day.
7      Q.   Are you aware that anybody called Mr.
8 Shiner and said, hey, where the heck is my
9 money?
10     A.   I think John talked to Mark and said
11 what's going on and Mark said he would handle
12 it. So that's all I can tell you.

ECF No. 217-8 at 4-6.

As reflected in the deposition transcript, Parker was asked five times if he (and Acunto) understood as of January 18, 2016, that the funds intended for a Tucker escrow account had been spent, and each time Parker unambiguously stated, "yes". Defendants cite Parker's deposition testimony and contend that the Court should disregard contrary statements in the Acunto, Parker, and Hellwig affidavits attempt to raise an issue of fact related to the timing of Prime's actual or constructive notice of any alleged misrepresentation related to the deposit funds. ECF No. 252 at 3-5.

In his affidavit, Parker asserts that he understood the deposition questions as inquiring into the timing of Prime's awareness of Shiner's alleged fraud. ECF No. 225 at 3. Parker contends that while Prime received information on January 18, 2016 that the escrow funds had been spent, Prime did not conclude until they "had a better understanding" in the summer of 2016 that *Shiner and Tucker* had committed fraud and that their fraud began in the last quarter of 2015. Id.

Parker's explanation conflicts with the clarity of his repeated responses to questions during his deposition and does not satisfactorily explain his concession that at a minimum, Prime knew as of January 18. 2016 that funds intended for an escrow account had been spent and that Thompson had submitted "a random pile of expense receipts to 'paper'" Prime's demand for documentation of expenses. Id. at 4. Parker contends, however, that Prime's conduct after January 18, 2016 "was consistent with a still-existing escrow account, not an empty shell." Id. Thus, according to Prime, there are issues of fact related to whether the statute of limitations bars its claims.

Prime argues that given Parker's explanation, Baer v. Chase, 392 F.3d 609 (3d Cir. 2004), compels rejecting Defendants' contention that the affidavits were prepared solely to raise issues of fact. Such expansive reliance is not warranted. In Baer, the plaintiff presented a claim for

quantum meruit for services rendered to the defendant in the development of a television show. The plaintiff testified in his deposition that he last performed services for the defendant in 1995. Upon the filing of defendant's motion for summary judgment raising the statute of limitations, the plaintiff filed an affidavit explaining that he was mistaken at this deposition; that in answering he was thinking in terms of the when he performed the bulk of his services. Instead, according to the affidavit, his last service was performed in 1997 and thus his lawsuit was not barred by the applicable statute of limitations. The district court granted summary judgment for defendant because the affidavit contradicted his deposition testimony on a critical matter that was the subject of repeated questioning. Id. at 623 - 625. The Third Circuit reversed. If plaintiff relied solely upon assertions of mistake, the Court held "exclusion of the later certification might have been appropriate." Id. However, the plaintiff presented a letter he sent in 1997 that included evidence of later services allegedly performed by the plaintiff. Thus, independent evidence documented the plaintiff's claim in his affidavit that he performed services in 1997 to corroborate his statement that his deposition testimony was mistaken.

Here, the parties' contemporaneous communications in the weeks following January 18, 2016, uniformly reflect that Prime knew the money was gone as of January 18, 2016, and that Prime would need to replenish the deposit funds at closing. ECF No. 217-28 at 9; ECF No. 217-30. Therefore, Prime demanded a "narrative and receipts" to explain how the deposit money was spent, and expressed frustration that Parker and Acunto had "to *repay* the $600,000 non-refundable deposit" and remit an additional $128,000 to cover the bank loan and other creditors. Id. (italics added). Emails in February 2016 reflect that Prime demanded proof that the funds had been sent to the bank "from Mark Shiner's trust account." See e.g., ECF No. 220-33. Acunto also confirms

that by February 20, 2016, Prime knew that the PSA misrepresented the status of encumbrances on the property. ECF No. 223 at 5-7.

The record includes correspondence from Prime's counsel in May 2016 asking Shiner to "verify" the location of the remaining deposit funds and whether those funds, estimated to be $521,000, were released before closing or remained in Shiner's escrow account. ECF No. 224 at 13. Prime asserts counsel's correspondence establishes that it was unaware of *Shiner's* alleged fraud until the summer of 2016. ECF No. 225 at 4. However, this evidence does not contradict *Parker's* undisputed knowledge in January and February 2016 that alleged material misrepresentations had been made related to the escrow account and that the funds were used for suspected fake expenses. Thus, applying the sham affidavit rule, the Court will disregard those portions of the proffered affidavits that conflict with Parker's clear and unambiguous deposition testimony that Prime had notice on or before January 18, 2016, that most of the deposit money was no longer in an escrow account and had been offset by significant unauthorized expenses.

### E.   Application of the Statue of Limitations

#### 1.   Accrual

Prime contends that the PSA and MarcellX Resolution "are the principal instrumentalities of the fraud" and contain several misrepresentations that support its claims. ECF No. 239 at 6-7. The PSA is dated November 25, 2015, and was executed December 15, 2015. ECF No. 255 ¶ 12; ECF No. 217-7. The Resolution was executed on December 18, 2015. ECF No. 217-5. Therefore, Prime's claims for fraud, misrepresentation, failure to supervise, and respondeat superior accrued no later than December 15, 2015, the date by which Prime contends it relied on representations set forth in the PSA related to Thompson's authority to sell the property, the existence of an attorney escrow account, and the absence of encumbrances or claims on the property. See SodexoMAGIC,

24 F.4th at 218 (fraud and misrepresentation claims arose as of date contract awarded and claimant relied on allegedly false promises). Prime did not file this lawsuit until March 15, 2018. Thus, Prime's claims are barred unless it can establish that the running of the statute of limitations is delayed or otherwise tolled.

### 2.   Discovery of Harm and Due Diligence

"[U]nder the inquiry notice approach, Pennsylvania's discovery rule only tolls the statute of limitations until the injured party has 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or the precise cause." Nupson v. Schaeder Harrison Segal & Lewis, LLP,  No. 18-2505, 2022 WL 4635943, at * 7 (E.D. Pa. Sept. 30, 2022), aff'd, No. 22-3401 (3d Cir. Feb. 3, 2023), reh'g den. Mar. 3, 2023. "[A]n 'unrebutted suspicion' of an injury caused by another is sufficient to trigger the statute of limitations in Pennsylvania." Id.

Prime received an email on January 18, 2016 informing it that only $13,000 of its $600,000 deposit remained "in escrow." It is undisputed that this information triggered Prime's suspicion and anger that the funds no longer resided in an escrow account and, at a minimum, that the funds were expended or offset without its approval. It is undisputed that on that same day, Prime received an expense list that it knew contained false information. Even if Prime "doubted" that its most recent deposit had been spent, Prime knew that expenses listed by Thompson were not authorized by them for the Swamp Angel property. ECF No. 225 at 4. It also is not disputed that as of February 20, 2016, Prime knew that the property was encumbered by mortgages that were not disclosed in the PSA, and that the Prushnoks had at least a 50% ownership interest in MarcellX. Thus, by February 20, 2016, Prime was aware of several allegedly material misrepresentations in the PSA

and the unauthorized use of its deposit money. As of that date, no reasonable finder of fact could conclude that Prime was unaware of "storm warnings" of fraud and, under Pennsylvania law, Prime had an obligation to exercise reasonable diligence to investigate the existence and cause of its injury before the expiration of the statute of limitations. Prime's failure to do so bars its claims. SodexoMAGIC, 24 F.4th 219 (counterclaimant's suspicion of a bait and switch sufficient to stop tolling the statute of limitations).

Prime contends that the statute of limitations does not bar its claims because notice of Thompson's fraud occurred separately from notice of Shiner and Tucker's alleged fraud. By isolating discovery of each actor's harmful conduct, Prime seeks to toll the statute of limitations on its claims against Shiner and Tucker until June 2016, when it "concluded" that the funds were never deposited in a Shriner/Tucker escrow account. ECF No. 245 at 4 ("In the case at bar, however, there were two sets of actors engaged in fraud: Shiner/TA and Thompson/Mid-East. The timing of Prime Energy's knowledge regarding Thompson/Mid-East's fraud may have differed from its knowledge regarding Shiner/TA's fraud."). Yet Pennsylvania law does not permit parties on inquiry notice to delay investigating who else may have participated or contributed to alleged harm. See Rice v. Diocese of Altoona-Johnstown, 255 A.3d at 251.

In Rice, the Pennsylvania Supreme Court held that accrual begins when a plaintiff knows of an injury and can maintain an action, not when it is aware of a secondary cause of a known legal injury. Id. This is because inquiry notice does not require notice of the full extent of an injury, actual negligence, or the precise cause – only an actual known cause of significant harm. In the case before it, the plaintiff sued the Diocese for its alleged role in covering up and facilitating sexual assaults by a Diocesan priest. Her claims against the Diocese were based on information

contained in a report issued by the Pennsylvania Office of Attorney General ten years after the plaintiff reported her assault to the authorities and to the Diocese.

The Pennsylvania Supreme Court held that her claims against the Diocese were barred by the statute of limitations. Once the plaintiff knew she had been assaulted by a Diocesan priest in 1983 or 1987, she was on "inquiry notice regarding other potentially liable actors, including the Diocese, as a matter of law." Id. at 251. Thus, the plaintiff needed to investigate what the Diocese knew about the priest, "its efforts to supervise or monitor him or its protocols, in general, for the placement of priests in parishes." Id. "The answer to the question of whether there may have been other causes [ ] needed to be investigated during the period of the statute of limitations." Id.

In this case, based on the deposition testimony of Parker and Acunto, as well as contemporaneous emails between the various parties to the PSA and Defendants, reasonable minds would not differ in finding that Prime was aware of "storm warnings" of possible fraudulent material misrepresentations related to the PSA in January – February 2016 when it was told that nearly all of its deposit money had been spent on items it suspected were unrelated to the Swamp Angel Lease purchase. Thus, Prime was placed on inquiry notice of all causes of harm, including any alleged misrepresentations by Shiner and any failure to supervise by Tucker. See, e.g., LabMD Inc. v. Boback, 47 F.4th at 180 (citing Cetel v. Kirwan Fin. Grp., Inc., 460 F.3d 494, 507 (3d Cir. 2006) ("[W]hen plaintiffs should have known of the basis of their claims depends on whether and when they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity.")).

Reasonable minds also would not differ that Prime failed to exercise reasonable diligence to "find and avoid the storm." Cetel, 460 F.3d at 507 (applying discovery rule in context of RICO claim). Had Prime asked for documentation regarding the status of the escrow account when it

received a list of expenses totaling $600,000 in January 2018 with a disclosure that only $13,000 remained in the escrow account, it would have learned the account was not held by Tucker as represented in the PSA, and confirmed that the funds were gone. In addition, there is no dispute that Prime knew of CNB Bank's lien well before March 15, 2016. Upon learning of at least one encumbrance, due diligence should have prompted Prime to investigate available public records to determine whether any other liens or claims impaired the Swamp Angel lease. It failed to do so. It similarly failed to act on its undisputed knowledge by March 2, 2016, that the property was owned in part by the Prushnoks. Thus, as much as Prime contends that ownership of the property was the subject of a material misrepresentation, due diligence would have led Prime to timely investigate Thompson's stated ownership of the property. Again, it failed to do so.

Under these circumstances, Prime cannot show: (1) that it exercised due diligence or, (2) that despite the exercise of due diligence it would not have learned of Shiner and Tucker's alleged fraud and misconduct until sometime after March 15, 2016. Consequently, as a matter of law, the discovery rule does not apply to toll the statute of limitations.

### 3.   Application of the Fraudulent Concealment Doctrine

The fraudulent concealment doctrine does not otherwise preserve Prime's claims. The Pennsylvania Supreme Court has held that "the standard applied under the discovery rule requiring that a plaintiff exercise reasonable diligence to discover both an injury and its causes also applies when fraudulent concealment is the asserted basis for tolling the statute of limitations." Rice, 255 A.3d at 252 (citing Fine, 870 A.2d at 860-61). "[A]pplying an identical due diligence standard to applications of both fraudulent concealment and the discovery rule 'will serve one of the overarching tenets in this area of our jurisprudence – the responsibility of a party who seeks to assert a cause of action against another to be reasonably diligent in informing himself of the facts

upon which his recovery may be based." Id. Thus, in Rice, the Supreme Court held that the Diocese's alleged false assurances regarding the priest's good standing and its refusal to tolerate sexual abuse of children were not sufficient to delay the plaintiff's duty to inquire into potential other cause of her injury once she knew she was assaulted. Id. at 252-53.

> Under our jurisprudence, before a plaintiff may invoke the principles of fraudulent concealment, the plaintiff must use reasonable diligence to investigate her claims. The statute of limitations on Rice's claim accrued when she knew she was injured by Bodziak. She had two years to investigate the Diocese's role, if any, in causing her injury. Assuming, arguendo, the imposition of a duty to speak, the failure to do so does not trump a plaintiff's due diligence obligation to investigate other possible causes of her known injury.

Id. at 253. Under the fraudulent concealment doctrine, Pennsylvania law does not presuppose that facts cannot be learned despite the exercise of due diligence. Id.

In this case, Prime makes no attempt to show it could not discover Shiner's alleged fraud or Tucker's alleged failure to supervise him through the exercise of due diligence. It is undisputed that Prime was told the funds were no longer in "escrow" and that it suspected it was being charged for operations that were unrelated to the Swamp Angel lease. See, e.g., ECF No. 217-4. Once it knew Thompson was spending "escrow funds" funds, that the property was encumbered by undisclosed bank loans, and that the Swamp Angel lease was at least partially owned by the Prushnoks, the alleged potential fraudulent misrepresentations related to the PSA were no longer concealed. At that time, Prime had an obligation to investigate other possible causes of injury, including alleged misconduct by Shiner and Tucker and the existence of environmental claims impacting the sale of oil and gas wells. Thus, as a matter of law, the two-year statute of limitations began to run at the latest on March 2, 2016. Because Prime did not file this lawsuit until March 15, 2018, its claims against Shiner and Tucker are time-barred.

## V.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment at ECF Nos. 212 and 250 filed on behalf of Defendants Tucker Arensberg, P.C. and Micheal A. Shiner are properly granted because Prime's claims are barred by the statute of limitations. An appropriate Order will follow.


Dated: June 7, 2023                    BY THE COURT:

                                       MAUREEN P. KELLY
                                       UNITED STATES MAGISTRATE JUDGE


cc:    All counsel of record by Notice of Electronic Filing